USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: 9/25/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTELLECTUAL PROPERTY WATCH and
WILLIAM NEW,

                      Plaintiffs,

     - against -

UNITED STATES TRADE REPRESENTATIVE,

                    Defendant.

---

**OPINION AND ORDER**

13 Civ. 8955 (ER)

Appearances:

Jonathan Manes
David A. Schultz
Media Freedom and Information Access Clinic, Yale Law School
New Haven, CT
*Attorneys for Plaintiffs*

Preet Bharara
Ellen Blain
United States Attorney, Southern District of New York
New York, NY
*Attorneys for Defendant*

Ramos, D.J.:

     Intellectual Property Watch and William New ("Plaintiffs") bring this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012), against the United States Trade Representative ("USTR," "the government," or "the agency"). Plaintiffs seek disclosure of documents related to the Trans-Pacific Partnership ("TPP"), a free-trade agreement currently being negotiated among eleven Asia-Pacific countries and the United States. (Doc. 1). USTR withholds certain documents in full and redacts portions of other documents, under various statutory exemptions to FOIA's disclosure requirements. The parties cross-move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Docs. 42, 48).  For the

following reasons, both parties' motions are GRANTED in part and DENIED in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Trans-Pacific Partnership

The TPP is a comprehensive free-trade agreement that the United States is currently

negotiating with eleven other countries in the Asia-Pacific region.[1]  Decl. Barbara Weisel Supp.

Gov't Mot. Summ. J. ("Weisel Decl.") (Doc. 44) ¶ 5.  The eventual goal is to include within the

agreement a region of Asia-Pacific countries that represents more than forty percent of global

output and over one-third of global trade.  *Id*. ¶ 6.  The scope of the negotiations is vast,

sweeping in trade in goods, textiles, services, investment, labor, the environment, e-commerce,

telecommunications, and intellectual property rights, to name only some of the covered issues.

*See TPP Issue-by-Issue Information Center*, OFFICE OF THE UNITED STATES TRADE

REPRESENTATIVE, https://ustr.gov/trade-agreements/free-trade-agreements/trans-pacific-

partnership/tpp-issue-issue-negotiating-objectives (last visited Sept. 15, 2015).  As of the date of

this Opinion and Order, the TPP is still being negotiated among the twelve nations.

At the outset of negotiations, all twelve of the negotiating countries, including the United

States, entered into a confidentiality agreement drafted and circulated by the Ministry of Foreign

Affairs and Trade for New Zealand.  Weisel Decl. ¶ 10; *id.*, Ex. A.  The agreement, in pertinent

part, states as follows:

> [A]ll participants agree that the negotiating texts, proposals of each Government,
> accompanying explanatory material, emails related to the substance of the
> negotiations, and other information exchanged in the context of the negotiations,

---

[1] The other countries are:  Australia, Brunei Darussalam, Canada, Chile, Japan, Malaysia, Mexico, New Zealand, Peru, Singapore, and Vietnam.  Weisel Decl. ¶ 5.

is provided and will be held in confidence, unless each participant involved in a communication subsequently agrees to its release. This means that the documents may be provided only to (1) government officials or (2) persons outside government who participate in that government's domestic consultation process and who have a need to review or be advised of the information in these documents. Anyone given access to the documents will be alerted that they cannot share the documents with people not authorized to see them. All participants plan to hold these documents in confidence for four years after entry into force of the Trans Pacific Partnership Agreement, or if no agreement enters into force, for four years after the last round of negotiations.

*Id.* ¶ 11. By entering into the agreement, the participating countries sought to encourage "frank exchanges of views, positions, and specific negotiating proposals" and to "facilitate the resolution of differing national interests and perspectives." *Id.* ¶ 12. While USTR stresses the importance of confidentiality to the securing of a final agreement, Plaintiffs point to a host of domestic and foreign legislators and outside commentators who have criticized the secrecy of the TPP process. *See, e.g.*, Mem. Supp. Pls.' Cross-Mot. Summ. J. ("Pls.' Br.") (Doc. 49) 2–3.

**B. Industry Trade Advisory Committees ("ITACs")**

The Trade Act of 1974 requires the President to "seek information and advice from representative elements of the private sector and the non-Federal governmental sector with respect to" trade negotiations, such as the TPP, and the U.S.'s overall trade policy. 19 U.S.C. § 2155(a) (2012). To fulfill this mandate, the Act authorizes the President to establish industry-specific advisory committees, populated by representative members of key sectors and groups of the economy affected by trade policy. *See* § 2155(c). The President has thus "established a comprehensive industry trade advisory committee (ITAC) system, with subcommittees devoted to specific areas" of the economy. Weisel Decl. ¶ 23. ITACs meet at the behest of USTR and "provide policy advice, technical advice and information, and advice on other factors" relevant to trade negotiations. § 2155(d). The ITACs most relevant to this litigation are (i) ITAC-3, addressing Chemicals, Pharmaceuticals, Health/Science Products and Services; (ii) ITAC-8,

addressing Information and Communications Technologies, Services, and Electronic Commerce; (iii) ITAC-10, addressing Services and Financial Industries; and (iv) ITAC-15, addressing Intellectual Property Rights.  Weisel Decl. ¶¶ 24–26; Pls.' Br. 4 n.1.

USTR, on behalf of the President, solicits input from ITAC members via a secured website, the "Cleared Advisor site," through which members can access and provide comments on draft negotiating texts and other relevant documents.  USTR and ITAC members also exchange information and advice over email and during in-person meetings.  "ITAC comments may range from technical comments on wording choices in draft negotiating texts to comments on overall U.S. policy on trade-related issues."  *Id.* ¶¶ 27–28.

The activities, organization, and responsibilities of the ITACs are laid out in the ITAC Operations Manual, jointly published by USTR and the United States Department of Commerce. *See* Suppl. Decl. Melissa Keppel ("Suppl. Keppel Decl.") (Doc. 63), Ex. A ("Ops. Manual").[2] "The Operations Manual is based upon the legal framework created by the 1974 Trade Act, as amended, the Federal Advisory Committee Act, statutes and Executive Orders relating to the handling of security classified information and public access to information…."  Ops. Manual v– vi.  As the Operations Manual explains, because ITAC members may receive "national-security classified or highly trade-sensitive" information in the process of advising USTR, they are required to obtain security clearances and make various assurances that they will keep the information they receive from USTR confidential.  *See id.* IV.1–4 (describing ITAC members' security clearances and obligations with respect to handling sensitive information).  The Operations Manual also explains the process by which ITAC members can make confidential

---

[2] The ITAC Operations Manual is also available at http://ita.doc.gov/itac/documents/ITAC-OpsManual-2014-18.pdf.

submissions to USTR, including confidential commercial or financial information and advice on trade policy and negotiations.  *See id.* IV.4–5.

## C. This Litigation

### (i) Plaintiffs' FOIA Request and USTR's Response

Plaintiff Intellectual Property Watch is a news organization that reports on international intellectual property issues.  Plaintiff William New is the Editor-in-Chief of Intellectual Property Watch.  On March 23, 2012, Plaintiffs filed their initial FOIA request seeking five categories of information from USTR:  (i) dates and locations of TPP negotiations and meetings; (ii) terms of the confidentiality agreement and related communications; (iii) draft text of TPP provisions related to intellectual property; (iv) U.S. negotiation positions regarding intellectual property; and (v) communications between USTR and ITACs 3, 8, 10, and 15.  *See* Pls.' Br. 3–4; Decl. Jonathan Manes ("Manes Decl.") (Doc. 52), Ex. A.  USTR responded almost a year later on March 19, 2013 and June 21, 2013, withholding all of the documents requested by Plaintiffs pursuant to various FOIA exemptions, save for the release of 354 pages of communications between USTR and ITACS.  Decl. Melissa Keppel ("Keppel Decl.") (Doc. 45) ¶ 6.

After filing an administrative appeal, Plaintiffs filed suit in this Court on December 18, 2013, which initiated a series of negotiations with USTR over possible further disclosures.  Pls.' Br. 4–5.  Those discussions resulted in the release of records concerning the schedule of TPP negotiations and the confidentiality agreement.  In addition, the parties entered into a joint stipulation endorsed by this Court on March 10, 2014, pursuant to which USTR would search for a representative sample set of documents based Plaintiffs' requests, which would then form the exclusive basis of the parties' anticipated cross-motions for summary judgment and the Court's rulings on those motions.  *See* Joint Stipulation and Order ("Stipulation") (Doc. 19) ¶¶ 4–6.  The

parties agreed that the following three categories of documents would constitute the

representative sample set:

> **Category 1 ("Decision Memoranda"):**  Category 1 constitutes USTR decision
> memoranda reflecting USTR's final proposals for TPP text and negotiating
> strategy regarding three TPP chapters identified by Plaintiffs, formulated prior to
> two rounds of TPP negotiations.[3]
>
> **Category 2 ("ITAC Communications"):**  Category 2 constitutes
> communications between USTR and ITAC members, as reflected in:  (i) emails
> identified in USTR's June 21, 2013 FOIA response as being withheld in full; (ii)
> emails identified as a result of search terms provided by Plaintiffs; and (iii)
> postings to the government's Cleared Advisor site, identified as a result of search
> terms provided by Plaintiffs.[4]
>
> **Category 3 ("Draft Chapters"):**  Category 3 constitutes draft TPP chapters
> identified by Plaintiffs, which were posted to a secure website shared by all TPP
> treaty partners, prior to two rounds of TPP negotiations.

Keppel Decl. ¶ 9; *see also* Pls.' Br. 4–5.

USTR's search for Decision Memoranda (Category 1) resulted in the retrieval of two

documents, totaling nine pages, both drafted by USTR staff and addressed to the acting United

States Trade Representative at the time.  The first document, dated April 12, 2012, is entitled

"Decision Memoranda on Addressing Trade Remedies-Related Proposals in TPP."  The second

document, dated May 9, 2013, is entitled "Decision Memoranda on TPP Copyright Parallel

Import Proposal."  USTR withholds both of these documents in full.  *See* Keppel Decl., Ex. A.

---

[3] Decision Memoranda, drafted by USTR staff for use by senior U.S. negotiators, contain "summaries about the work and progress of the TPP by USTR staff...; candid assessment about issues affecting or impeding the progress of the deliberations and/or reaching of consensus on certain topics; and suggestions about how USTR senior negotiators might approach various negotiating partners during the TPP meetings."  Suppl. Decl. Barbara Weisel (Doc. 62) ¶ 5.

[4] "TPP" and "Trans Pacific Partnership" were the two designated search terms for the ITAC emails.  The designated search terms for postings to the Cleared Advisor site were:  "intellectual property, trade secret, industrial design, patent, trademark, copyright, geographical indication, e-commerce, infring*, pharmaceutical."  *See* Suppl. Keppel Decl. ¶¶ 3–4.

The search for ITAC Communications (Category 2) initially resulted in the retrieval of approximately 700 pages' worth of emails, roughly 300 of which were withheld in full and 400 of which were redacted in part pursuant to various FOIA exemptions.  *See id*., Exs. C, D.  The search also resulted in the retrieval of forty-one pages' worth of postings to the Cleared Advisor site, which were all disclosed but partially redacted.  *See id.*, Ex. B.

The search for Draft Chapters (Category 3) resulted in the retrieval of twenty-one responsive documents, totaling 200 pages.  These constituted draft texts of the chapters on TPP Intellectual Property Rights, TPP E-Commerce, and TPP Trade Remedies.  USTR withholds all of these documents in full.  *See id.*, Ex. A.

Such was the universe of documents on which the parties initially moved for summary judgment.  This was based on an explicit assurance from USTR that the agency had "conduct[ed] a review of each page of the responsive records at issue, and determin[ed] that all reasonably segregable information has been disclosed."  Mem. Supp. Gov't Mot. Summ. J. ("Gov't Br.") (Doc. 43) 25.  In the middle of summary judgment briefing, however, "USTR learned new information concerning the extent to which certain ITAC communications has been shared in public settings," discovering that certain "advice or specific proposals for TPP provisions" had been "shared with members of the public during stakeholder events surrounding the TPP negotiations."  Suppl. Keppel Decl. ¶ 1.  Thus, on February 17, 2015 and March 6, 2015, USTR released an additional 149 pages of ITAC emails in full, and re-released approximately 413 pages of emails with fewer redactions.  *Id.* ¶¶ 1–2.  The result is that roughly 150 pages of emails remain withheld in full, and another 413 pages of emails remain redacted in part.  Once again, USTR maintains that after "multiple, detailed, line-by-line reviews of each and every page of the

responsive records at issue," all the government's claimed withholdings and redactions remain proper under FOIA.  *Id.* ¶¶ 10–11.

**(ii) USTR's Claimed FOIA Exemptions**

USTR claims various FOIA exemptions for the documents and records at issue.

Decision Memoranda are withheld under 5 U.S.C. § 552(b)(1) ("Exemption 1") and § 552(b)(5) ("Exemption 5").  *See* Keppel Decl., Ex. B.  Exemption 1 covers matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  § 552(b)(1).  Exemption 5 applies to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  § 552(b)(5).  Here, the parties debate whether Exemption 5 applies by virtue of the "deliberative process" privilege, "which protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions."  *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

Various documents and portions of documents constituting ITAC Communications are withheld or redacted under Exemption 1, § 552(b)(3) ("Exemption 3"), § 552(b)(4) ("Exemption 4"), and Exemption 5.[5]  Specifically, every redaction of an ITAC Communication is made under Exemptions 3 and 5, while some redactions are also made under Exemptions 1 and 4.  *See* Keppel Decl. ¶ 12; Rep. Mem. Supp. Gov't Mot. Summ. J. ("Gov't Rep.") (Doc. 61) 2. Exemption 3 applies to matters "specifically exempted from disclosure by statute," where that statute either "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to

---

[5] USTR has also redacted personal information, such as email addresses, from ITAC Communications, pursuant to § 552(b)(6).  Plaintiffs do not contest those redactions.

particular types of matters to be withheld."  § 552(b)(3)(A).  Exemption 4 applies to "trade

secrets and commercial or financial information obtained from a person and privileged or

confidential."  § 552(b)(4).

Finally, USTR withholds Draft Chapters in full under Exemption 1.  Keppel Decl. ¶ 14.

Plaintiffs object to all of these claimed exemptions, and seek full disclosure of all three

categories of documents constituting the sample set.


## II. LEGAL STANDARD

FOIA reflects a "general philosophy of full agency disclosure unless information is

exempted under clearly delineated statutory language."  *Bloomberg, L.P. v. Bd. of Governors of*

*the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (quoting *Dep't of the Air Force v. Rose*,

425 U.S. 352, 360–61 (1976)) (internal quotation marks omitted).  FOIA's statutory exemptions

are thus "given a narrow compass."  *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151

(1989); *see also Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve*

*Sys.*, 463 F.3d 239, 244 (2d Cir. 2006).  "The agency asserting the exemption bears the burden of

proof, and all doubts as to the applicability of the exemption must be resolved in favor of

disclosure."  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009).  The Court "decides *de*

*novo* whether the agency has sustained its burden" to justify particular withholdings.

*Bloomberg, L.P.*, 601 F.3d at 147 (citing 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Justice v.*

*Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989)).

"'Summary judgment is the procedural vehicle by which most FOIA actions are

resolved.'"  *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior* ("*NRDC*"), 73 F. Supp. 3d 350,

355 (S.D.N.Y. 2014) (quoting *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509

(S.D.N.Y. 2007)).  "Summary judgment is appropriate only where the parties' submissions 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting Fed. R. Civ. P. 56(c)).  "Where, as here, the parties have filed cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *N.Y. Times Co.*, 499 F. Supp. 2d at 509 (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

"'[S]ummary judgment in favor of the FOIA plaintiff' is appropriate '[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption,' but should be denied if the agency satisfies its burden 'to show that requested material falls within a FOIA exemption.'"  *Id.* (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)).  "An agency that has withheld responsive documents pursuant to a FOIA exemption can carry its burden to prove the applicability of the claimed exemption by affidavit…."  *Wilner*, 592 F.3d at 73.  "'Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## III. DISCUSSION

## A.  Decision Memoranda (Category 1) and Draft Chapters (Category 3)

Exemption 1 allows withholding of documents that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Here, USTR claims that Decision Memoranda and Draft Chapters are properly classified pursuant to Executive Order 13526, entitled "Classified National Security Information."  Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526").

E.O. 13526 § 1.1(a) sets forth four requirements for proper classification of information. Only one requirement is contested here,[6] *see* Pls.' Br. 6, i.e., whether "the unauthorized

---

[6] Information may be classified under E.O. 13526 if the following four conditions are met:

(1)  an original classification authority is classifying the information;

(2)  the information is owned by, produced by or for, or is under the control of the United States Government;

(3)  the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4)  the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 13526 § 1.1(a).  With respect to the requirement set forth in § 1.1(a)(3), USTR contends that all of the withheld information here falls within the category of "foreign government information," § 1.4(b), which Plaintiffs do not dispute.  "Foreign government information" is defined in pertinent part as:

(1)  information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence;

(2)  information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, requiring that the information, the arrangement, or both, are to be held in confidence….

*Id.* § 6.1(s).

11

disclosure of the information reasonably could be expected to result in damage to the national security," E.O. 13526 § 1.1(a)(4).  "Damage to the national security" is defined as "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information."  E.O. 13526 § 6.1(l).  The focus here is on whether disclosure could cause "harm to the…foreign relations of the United States."  *Id*.

The parties agree that the proper standard is for the Court to independently assess whether USTR's assertions of reasonably-expected harm are "plausible" and "logical."  *See* Pls.' Br. 7; Gov't Br. 12.  This relatively deferential standard represents a recognition that the Executive branch is better positioned than the judiciary to determine whether specific disclosures could damage the national security.  *See, e.g.*, *Ctr. for Constitutional Rights v. C.I.A.*, 765 F.3d 161, 166 (2d Cir. 2014) ("Notwithstanding the presumption in favor of disclosure, when the claimed exemption implicates national security, 'an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.'") (quoting *Wilner*, 592 F.3d at 69), *cert. denied*, 135 S. Ct. 1530 (2015).

Plaintiffs do not seek disclosure of information in the Decision Memoranda or Draft Chapters provided *by* foreign governments *to* the United States.  Rather, Plaintiffs claim entitlement only to "information that the *United States* has shared with foreign counterparties regarding its *own* negotiating positions and proposals, as well as positions and proposals that the United States has accepted as its own."  Pls.' Br. 7.

USTR contends that the disclosure of U.S. positions and proposals, provided to foreign governments under the confidentiality agreement, "would discourage such exchanges, undermine trust in USTR's TPP negotiators, and make it extremely difficult or impossible to conclude an

agreement, because negotiating partners would be more likely to adopt and maintain rigid negotiating positions unfavorable to United States economic interests."  Gov't Br. 14–15.  USTR also claims that disclosure would "adversely affect the United States' credibility as a negotiating partner for future trade negotiations."  *Id*. at 15.  Plaintiffs argue that it is not plausible or logical that such disclosure would harm foreign relations, because the positions and proposals have already been shared with foreign governments would be made public if the TPP is finalized, and because mere release of the U.S.'s *own* positions and proposals would not constitute a "breach of trust" capable of harming TPP or future negotiations.  *See* Pls.' Br. 7–8; Rep. Mem. Supp. Pls.' Cross-Mot. Summ. J. ("Pls.' Rep.") (Doc. 67) 4.

 As a preliminary matter, by limiting its request to U.S. positions and proposals, Plaintiffs have already disclaimed entitlement to much of the content of the Decision Memoranda.  These documents contain analysis by federal officials about the pros and cons of different negotiating positions that the U.S. could take, "summaries about the work and progress" already made in TPP negotiations, and "candid assessments" about how to reach consensus with (or overcome opposition from) other negotiating countries.  *See* Suppl. Decl. Barbara Weisel ("Suppl. Weisel Decl.") (Doc. 62) ¶¶ 1–8.  None of this information represents USTR's final positions and proposals shared with foreign governments.  In addition, the government asserts that "the Decision Memoranda are inextricably interwoven with information USTR learned from foreign counterparts, and therefore no information therein can be reasonably segregated and released."  *Id*. ¶ 8.  Given the short length of the two memoranda and their analytical character, the Court has no reason to doubt this assertion, and Plaintiffs do not offer one.

 Even assuming that final U.S. positions and proposals could be segregated, however, there may be good reasons why other nations participating in TPP negotiations would not want

the proposals they received from the U.S. to be made public prior to consummation of the

agreement.  The confidentiality agreement specifically directs that "negotiating texts" and

"proposals of each Government" be held "in confidence, unless *each participant involved* in a

communication subsequently agrees to its release."  Weisel Decl. ¶ 10–11 (emphasis added).

Such a requirement explicitly contemplates a foreign nation's objecting to the U.S.'s unilaterally

release of U.S. proposals; the agreement takes aim at precisely this kind of negotiating in public.

And indeed, the fact that the New Zealand government was the impetus for the agreement

demonstrates that the specter of unilateral disclosure is of concern to more countries than just

United States.  *See id.*, Ex. A (letter from Ministry of Foreign Affairs and Trade for New Zealand

proposing text of confidentiality agreement).  While violation of a confidentiality agreement

does not *per se* satisfy the government's burden under Exemption 1, the existence of a specific

confidentiality agreement in the context of specific negotiations is undoubtedly relevant.  *Cf.*

*Lawyers All. for Nuclear Arms Control-Phila. Chapter v. Dep't of Energy*, 766 F. Supp. 318,

322–23 (E.D. Pa. 1991) (noting that it was "self-evident" that release of information subject to

confidentiality agreement with foreign nation would harm U.S.'s ability to negotiate in future,

but proceeding to determine whether opposing foreign nation objected to specific disclosure and

whether specific disclosure would inherently harm national security).

　　　Furthermore, the fact that TPP negotiations are ongoing makes USTR's claims of harm

particularly plausible in this case.  *See Brayton v. Office of U.S. Trade Representative*, 657 F.

Supp. 2d 138, 145 (D.D.C. 2009) (concluding that USTR was entitled to withhold document

revealing its own sensitive negotiation position, where document was covered by confidentiality

agreement and related to ongoing trade negotiation between the U.S. and European Union), *aff'd*,

641 F.3d 521 (D.C. Cir. 2011); *cf. Fulbright & Jaworski v. Dep't of Treasury*, 545 F. Supp. 615,

619 (D.D.C. 1982) ("Disclosure of [negotiation-strategy document] would probably undermine the ability of U. S. negotiators to obtain desirable results in treaty negotiations because the document so clearly sets forth the U. S. goals, rationales and past experiences."). This fact alone distinguishes *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative*, the case upon which Plaintiffs most heavily rely, which permitted disclosure of a U.S. position from a long-concluded and failed negotiation of an international trade agreement, and was eventually reversed by the D.C. Circuit Court of Appeals in any event. *See* 845 F. Supp. 2d 252, 254 (D.D.C. 2012) ("The United States took part in FTAA negotiations during the 1990s and 2000s, but no agreement was reached."), *rev'd*, 718 F.3d 899 (D.C. Cir. 2013).

Potential harm to future trade negotiations is also, at the very least, plausible. As Plaintiffs fail to recognize, disclosure may very well reduce the U.S.'s flexibility and complicate information exchanges and bargaining with other countries not involved in TPP negotiations, regardless of the fact that the other eleven countries participating in the TPP are already privy to U.S. positions and proposals. *See Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative* ("*CIEL*"), 718 F.3d 899, 903 (D.C. Cir. 2013) ("Absent disclosure of [document containing a U.S. negotiating position], these other governments would not know the position the United States had taken in the earlier negotiations.").[7]  "Whether—or to what extent—this reduced flexibility might affect the ability of the United States to negotiate future trade agreements is not for [the Court] to speculate." *Id*.

While the Court generally agrees with Plaintiffs that USTR's declarations justifying withholding under Exemption 1 are not particularly detailed, and should have contained a more rigorous discussion of why disclosure of positions on the *particular topics* discussed in the two

---

[7] Plaintiffs' assertion that all U.S. positions and proposals will inevitably be made public, Pls.' Br. 8, lacks support in the record. *See* Gov't Rep. 5–6 & n.4.

Decision Memoranda would harm negotiations, the government's showing here is nonetheless sufficient, if minimally so. "[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012) (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003)). "Courts are 'in an extremely poor position to second-guess' the Trade Representative's predictive judgment in these matters…." *CIEL*, 718 F.3d at 903 (quoting *Larson*, 565 F.3d at 865). Since proper classification requires only a plausible argument that disclosure "*reasonably could be expected* to result in damage to the national security," E.O. 13526 § 1.1(a)(4) (emphasis added), it is particularly unlikely that judicial second-guessing would be appropriate absent a truly illogical argument from the government. *See CIEL*, 718 F.3d at 903–04. That is not the case here. The Decision Memoranda are thus properly withheld in full pursuant to Exemption 1.

The same analysis applies with equal force to the Draft Chapters. It is both logical and plausible that unilateral disclosure of Draft Chapters, in explicit violation of the very first term of the TPP confidentiality agreement, would harm foreign relations, especially prior to consummation of the final agreement. Importantly, disclosure in this case might establish a precedent that all draft text in all future trade negotiations involving the U.S. would be subject to FOIA disclosure. Absent any such limiting principle, formal confidentiality agreements would be rendered futile, and the Court accepts as reasonable the government's argument that such agreements are critical preconditions to successful multilateral trade negotiations. *See* Weisel Decl. ¶¶ 9, 13. Tellingly, Plaintiffs do not cite a single case in which draft text of an inchoate international agreement has been disclosed under FOIA.

The Decision Memoranda and Draft Chapters are thus properly withheld under Exemption 1, and the Court grants summary judgment in favor of USTR with respect to those two categories of documents.[8]

## B.  ITAC Communications (Category 2)

### (i) Exemption 1

Again, Plaintiffs only request for documents subject to Exemption 1 is for information that the U.S. shared with foreign counterparties regarding its own positions and proposals.  Pls.' Rep. 4.  The Court has already found it logical and plausible that disclosure of such information could reasonably be expected to harm foreign relations.  USTR's justifications are no less logical and plausible simply because U.S. positions and proposals are embedded in ITAC Communications rather than in Decision Memoranda or Draft Chapters.  Therefore, the Court also grants summary judgment in favor of USTR with respect to withholdings of ITAC Communications under Exemption 1.

### (ii) Exemption 3:  Section 2155(g) Remains A Withholding Statute

"Exemption 3 permits the Government to withhold information from public disclosure provided that: (1) the information is 'specifically exempted from disclosure by statute'; and (2) the exemption statute 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue' or 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'"  *Am. Civil Liberties Union*, 681 F.3d at 72 (quoting 5 U.S.C. § 552(b)(3)).  "In *CIA v. Sims*, 471 U.S. 159 (1985), the Supreme Court adopted a two-pronged approach to evaluating an agency's invocation of FOIA Exemption 3:  First, the court must consider whether the statute identified by the agency is a statute of exemption as

---

[8] Since the Decision Memoranda are properly withheld under Exemption 1, it is not necessary to determine whether the documents are also properly withheld under Exemption 5.

contemplated by Exemption 3.  Second, the court must consider whether the withheld material satisfies the criteria of the exemption statute." *Wilner v. Nat'l Sec. Agency*, No. 07 Civ. 3883 (DLC), 2008 WL 2567765, at *4 (S.D.N.Y. June 25, 2008), *aff'd*, 592 F.3d 60 (2d Cir. 2009).

USTR withholds portions of ITAC Communications under Exemption 3 by relying on 19 U.S.C. § 2155(g) (2012), one provision of the statute that establishes the ITACs and outlines their advisory functions and operations.  Section 2155(g), entitled "Trade secrets and confidential information," contains three sub-sections, relevant portions of which are reprinted below:

> (g)(1) Trade secrets and commercial or financial information which is privileged or confidential, and which is submitted in confidence *by* the private sector or non-Federal government *to* officers or employees of the United States in connection with trade negotiations, *may be disclosed upon request to*--[certain designated Executive branch and Congressional officials, for use in connection with advice on trade negotiations];

> (g)(2) Information other than that described in paragraph (1), and advice submitted in confidence *by* the private sector or non-Federal government *to* officers or employees of the United States, to the Advisory Committee for Trade Policy and Negotiations, or to any [ITAC], [in connection with advice on trade negotiations], *may be disclosed upon request to*--[the individuals described in (g)(1), plus other ITAC members];

> (g)(3) Information submitted in confidence *by* officers or employees of the United States…*to* any [ITAC], *may be disclosed in accordance with rules issued by the United States Trade Representative*….Such rules shall define the categories of information which require restricted or confidential handling by such committee considering the extent to which public disclosure of such information can reasonably be expected to prejudice the development of trade policy, priorities, or United States negotiating objectives….

§ 2155(g)(1)–(3) (emphasis added).

The parties strenuously dispute whether § 2155(g) is a withholding statute for purposes of Exemption 3.  USTR argues that § 2155(g) is a withholding statute and, to bolster its position, points to the Senate Finance Committee's report on the original Trade Act of 1974.  Gov't Rep. 10–11.  The report stated that the provision eventually codified

at § 2155(g)(2) "would establish a limited statutory exemption to the Freedom of

Information Act," which the Committee found "necessary due to the nature of the

information involved and the adverse impact which such information could have on the

ability of the United States effectively to carry out the multilateral trade negotiations."  S.

Rep. No. 93-1298 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7186, 7251.[9]

The problem with this legislative history, as Plaintiffs point out, is that the

originally-enacted version of § 2155(g) to which the Finance Committee report refers was

in fact worded as a *mandatory prohibition on disclosure*.[10]  It was only in 1988 that the

statutory provision assumed its current form, when Congress (i) removed the original

"shall not be disclosed to any person" language, and (ii) replaced it with the current "may

be disclosed upon request" language.  *See* Pls.' Br. 12–13 & n.4 (citing Omnibus Foreign

Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 § 1631(g), 102 Stat. 1107,

1267–68).  The legislative history is silent as to whether the 1988 revision was meant to

affect the statute's status in connection with FOIA.  USTR contends that this silence

means Congress did not intend to change § 2155(g)'s status as a withholding statute.  *See*

---

[9] Presumably, this comment addressed only the eventual § 2155(g)(2) because information covered by (g)(1) was already exempt from FOIA under Exemption 4.  *Cf.* Ops. Manual VI.4–5 (notifying ITAC members that USTR would use the standard analysis under FOIA Exemption 4 to determine whether (g)(1) or (g)(2) would apply to confidential information communicated from the private sector to USTR).

[10] The relevant portions of the original version of the statute read as follows:

> (g)(1)(A) Trade secrets and commercial or financial information which is privileged or confidential, submitted in confidence by the private sector to officers or employees of the United States in connection with trade negotiations, *shall not be disclosed to any person other than to--* [designated government officials]….

> (g)(1)(B) Information, other than that described in paragraph (A), and advice submitted in confidence by the private sector to officers or employees of the United States, to the Advisory Committee for Trade Negotiations or to any [ITACs]…*shall not be disclosed to any person other than to--*[designated government officials]….

Trade Act of 1974, Pub. L. No. 93-618 § 135(g), 88 Stat. 1978, 1997–98 (emphasis added).

Gov't Rep. 12.  Plaintiffs respond that USTR's interpretation renders the 1988

amendment a pointless exercise, because it posits that replacing a clear prohibition on

disclosure with language that permissively allows disclosure affected *no* change to the

statute.  Pls.' Rep. 8–9.  Instead, Plaintiffs argue that the amendment stripped § 2155(g)

of its status as a withholding statute because, as currently structured, it grants USTR

"standardless discretion" to determine what may or may not be disclosed.  *Id.*

Because the statute no longer prohibits disclosure on its face, it can only qualify

as a withholding statute if it either "establishes particular criteria for withholding" or

"refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A)(ii).[11]

USTR thus argues that § 2155(g) is a withholding statute because (g)(1) and (g)(2)

explicitly refer to "particular types of matters to be withheld" in the first clause of each

section, and because (g)(3)'s instruction to disclose confidential information submitted by

U.S. officials only in accordance with USTR-issued rules, which USTR identifies in its

ITAC Operations Manual, sufficiently invokes both "particular types of matters" and

"particular criteria for withholding."  *See* Gov't Rep. 9–10; Ops. Manual.  Plaintiffs

respond that there is nothing "particular" about these provisions, because the combination

of (g)(1), covering trade secrets and confidential commercial and financial information,

with (g)(2), covering information not covered by (g)(1) plus confidential advice, leaves

USTR with plenary discretion to determine whether *any* information it receives will be

withheld or not.  Likewise, (g)(3) affords USTR unilateral power to pick and choose

---

[11] USTR does not argue that § 2155(g) is a withholding statute because it "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue."  § 552(b)(3)(A)(i).  As Plaintiffs concede, Pls.' Rep. 9, there is little doubt that the original, pre-1988 version of § 2155(g) would so qualify.  *Cf. Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 511 (D.C. Cir. 2011) (noting parties' agreement that near-identical statute, directing that confidential information to and from advisory committee "shall not be disclosed," was withholding statute under Exemption 3) (citing 19 U.S.C. § 2605(i) (2012)).

whether information it submits is confidential.  *See* Pls.' Br. 13–14; Pls.' Rep. 6–7; *see also Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 628 (D.C. Cir. 1978) (explaining that Exemption 3's "particularity" requirements "assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch").

The text of the statute is certainly inartful, but ultimately Plaintiffs' interpretation is overly formalistic and implausible.  Section 2155(g)(3), the clearest of the three sub-sections, instructs USTR to establish rules for sorting between (i) information provided by the agency that requires "restricted or confidential handling," and (ii) information provided by the agency that is appropriate for "public disclosure."  It is commonsense that (g)(1) and (g)(2) serve the same function for matters submitted to USTR by the private sector—instructing the agency to withhold confidential information and advice from the public, and permitting only limited disclosure to certain key Executive and Congressional officials involved in trade negotiations.  Although these provisions do not explicitly direct USTR to withhold confidential matters from the public, such a directive is nonetheless the most reasonable reading and is consistent with the rest of the statute and its legislative history.  *Cf.* § 2155(f) (authorizing the President and designees to exempt ITACs from requirements in the Federal Advisory Committee Act relating to open meetings, public notice, public participation, and public availability of documents); S. Rep. No. 93-1298 (stating that the purpose of original 1974 version of § 2155(g) was to "insure maximum participation by the private sector in these negotiations").  It is also difficult to discern any plausible purpose of the provision under Plaintiffs' interpretation. If the statute merely informs USTR that it has plenary discretion to disclose or withhold any information as it sees fit, as Plaintiffs attest, there would be no reason to single out

specific entities that USTR may disclose to, nor indeed any reason to have the provision at all.  Plaintiffs' only attempt at an explanation—that the statute is "more plausibly read as eliminating background constraints that might otherwise impede government information sharing with ITACs"—is unconvincing.  Pls.' Rep. 8.

While Plaintiffs argue that the statute does not refer to "particular types of matters" because it is worded as an open-ended grant of discretion to USTR to pick and choose what will be withheld, Pls.' Br. 13–14; Pls.' Rep. 6–7, the Court agrees with USTR that it does not have the unbridled discretion that Plaintiffs allege, *see* Gov't Br. 17.  The title of § 2155(g), "Trade secrets and confidential information," suggests that the provision applies only to information *already deemed* confidential, not all information as Plaintiffs maintain, and thus it does not empower USTR to unilaterally determine what is withheld from the public.  Indeed, the record demonstrates that USTR will always grant confidential status to information that private-sector actors wish to submit in confidence; the only discretion USTR exercises is whether such confidential information is sensitive enough in nature to be withheld from other ITAC members under § 2155(g)(1), or whether it is less sensitive and thus subject to disclosure to other ITAC members under (g)(2).  *See* Ops. Manual VI.4–5 (notifying private-sector actors that they are free to submit information in confidence, but that the determination of whether other ITAC members may view the information is "reserved to the U.S. government"); *see also* Suppl. Keppel Decl. ¶ 10 (describing part of government's FOIA review process in this case as "contact[ing] the ITAC members who drafted many emails and documents *to determine whether they submitted certain information and/or advice in confidence*") (emphasis added).  Read in this light, the statute *does* refer to "particular types of

matters"—information and advice that the submitter opts to provide in confidence—and it instructs USTR that it may only disclose these confidential matters to certain key government officials.[12]  This represents a judgment by the legislative branch, not the Executive branch, that meaningful participation by the private sector in trade negotiations requires a vehicle for voluntary submission of information and advice to the government in confidence.  *Cf. Kreps*, 574 F.2d at 628–29.

Although the Court acknowledges that its conclusion that the 1988 amendment did not change § 2155(g)'s status as a withholding statute suggests that the amendment was, as Plaintiffs maintains, a pointless exercise, the conclusion is more compelling than the argument that Congress intended to completely invert the meaning of § 2155(g) and failed to say so anywhere in the legislative history.  Indeed, though neither party cites it, the legislative history of an earlier version of the 1988 amendment implies that the purpose of the change was *not* to authorize USTR to disclose confidential information, but rather to clarify that the statute would not be "construed to affect the ability of the Congress, any Congressional committee, or the Comptroller General to obtain trade secrets and commercial or financial information or any information submitted, in accordance with Federal statutes and the rules of the House and Senate."  Conference Report on H.R. 3, Omnibus Trade and Competitiveness Act of 1988 (Part 4 of 5), 134 Cong. Rec. H. 1863 (Apr. 20, 1988).  This history suggests, in other words, that the 1988 amendment sought only to ensure that the provision would not prevent the government

---

[12] One obvious implication of this interpretation is that private-sector information submitted to USTR *not* in confidence is available via FOIA.  Notably, USTR appears to agree, disclosing a second round of ITAC Communications after discovering that the information had been "shared with members of the public during stakeholder events surrounding the TPP negotiations."  Suppl. Keppel Decl. ¶ 1.

from accessing trade secrets and confidential information through other legal avenues, hence the removal of the "shall not be disclosed" language.  While by no means determinative, this piece of evidence is a more plausible explanation than either party has offered here, and it cuts in favor of § 2155(g)'s continued status as a withholding statute even after the 1988 amendment.

Thus, the Court holds that § 2155(g) is a withholding statute for purposes of Exemption 3.  That does not establish that USTR's particular withholdings in this case are within the purview of § 2155(g), however.  The Court turns to that question now.

**(iii) Exemption 3 (§ 2155(g)(1)) and Exemption 4**

USTR's justifications for Exemption 3 withholdings pursuant to § 2155(g)(1) and those for Exemption 4 withholdings are coextensive.  *See* Gov't Rep. 13–14 (citing declarations justifying (g)(1) withholdings in portion of brief discussing Exemption 4 withholding); Ops. Manual IV.4–5 (informing ITAC members that USTR will run an Exemption 4 analysis to determine if confidential information qualifies for (g)(1) protection).  Plaintiffs do not contest this equivalence.  *See* Pls.' Rep. 9.  As this issue is not disputed, and the statutory language in § 2155(g)(1) and § 552(b)(4) is indeed nearly identical, the Court will analyze these two categories of USTR withholdings together.

"Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *Am. Civil Liberties Union v. F.B.I.*, 59 F. Supp. 3d 584, 594 (S.D.N.Y. 2014) (quoting *Wilner*, 592 F.3d at 72).  "In evaluating whether Exemption 3 applies, a court should 'not closely scrutinize the contents of the withheld document; instead, [it should] determine only whether there is a

relevant statute and whether the document falls within that statute.'" *Id.* (quoting *N.Y. Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 316 (S.D.N.Y. 2012)) (alteration in original). Here, USTR "has the burden of proving the applicability of a FOIA exemption and 'may meet its burden by submitting a detailed affidavit showing that the information logically falls within the claimed exemptions.'" *Wilner*, 592 F.3d at 72–73 (quoting *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996)).  Thus, USTR's submitted declarations must establish that its withholdings under § 2155(g)(1) contain "[t]rade secrets and commercial or financial information which is privileged or confidential, and which is submitted in confidence by the private sector or non-Federal government…."  Again, whether the withholdings here so qualify is the same analysis as whether they qualify under Exemption 4.

For Exemption 4 to apply, (1) the information "must be a 'trade secret' or 'commercial or financial' in character," (2) "must be 'obtained from a person,'" and (3) "must be 'privileged or confidential.'"  *Inner City Press*, 463 F.3d at 244 (quoting 5 U.S.C. § 552(b)(4)) (other citations omitted).  Plaintiffs dispute both the first "commercial" character prong and the third "confidential" prong of this test.  *See* Pls.' Br. 16–17; Pls.' Rep. 9–10.

"To qualify for the exemption, information itself must in some fashion be commercial or financial in nature or use."  *N.Y. Pub. Interest Research Grp. v. U.S. Envtl. Protection Agency* ("*NYPIRG*"), 249 F. Supp. 2d 327, 333 (S.D.N.Y. 2003).[13]  But "what counts as 'commercial' is not well-defined in the case law.  Nor does the case law provide much guidance on the meaning of 'financial.'"  *Plumbers & Gasfitters Local Union No. 1 v. U.S. Dep't of the Interior*, No. 10-cv-4882 (CBA), 2011 WL 5117577, at *2 (E.D.N.Y. Oct. 26, 2011).  "Whatever 'commercial or financial' means at the margins, at its core are 'records that reveal basic commercial operations,

---

[13] USTR is only claiming to withhold commercial and financial information, not trade secrets.  Gov't Rep. 13 n.9.

such as sales statistics, profits and losses, and inventories, or relate to the income-producing

aspects of a business.'"  *Id.* (quoting *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280,

1290 (D.C. Cir. 1983)); *see also NYPIRG*, 249 F. Supp. 2d at 334 (listing information with

"intrinsic commercial value," information that "would jeopardize [] commercial interests or

reveal information about [] ongoing operations" if disclosed, and information "generated [] for a

purpose other than advocating a policy to a governmental agency").

      What constitutes "confidential" information is more easily discerned.  "[I]nformation is

confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of

impairing the government's ability to obtain…necessary information [] in the future, or (2) of

causing substantial harm to the competitive position of the person from whom the information

was obtained.'"  *Inner City Press*, 463 F.3d at 239 (quoting *Cont'l Stock Transfer & Trust Co. v.

SEC*, 566 F.2d 373, 375 (2d Cir. 1977) (per curiam)).  USTR claims that the withheld

information here is "confidential" based only on the first prong, Gov't Br. 20, which "accounts

for the governmental interest in maintaining open access to voluntary submissions, for it requires

the court to consider what, if any, impairment disclosure might have on the government's ability

to obtain desired information from third-party sources."  *NYPIRG*, 249 F. Supp. 2d at 335 (citing

*Comdisco, Inc. v. Gen. Servs. Admin.*, 864 F. Supp. 510, 517–18 (E.D. Va. 1994)).

      USTR argues that the withheld ITAC Communications contain "analyses of meetings or

conversations between a particular [ITAC] member, individual firm, or industry association and

a commercial or governmental counterpart from one of the negotiating countries."  Suppl.

Keppel Decl. ¶ 5.  The information also includes "emails comparing TPP draft text to the text of

other Free Trade Agreements (FTAs) in force while advocating for certain language from those

other FTAs to be included or omitted from the TPP," as well as "emails providing company or

industry data to explain why a particular entity or association does or does not support a particular TPP position, proposal or provision." *Id.*  Overall, USTR maintains, these communications "reveal commercial and financial information, such as the potential effects of particular negotiating positions and draft text on an entity's or an industry's financial performance." *Id.*

Plaintiffs, in response, argue that USTR has mostly just described materials containing "ITAC members' *policy opinions*, which are not commercial or financial information and are not exempt." Pls.' Rep. 9; *see also* Pls.' Br. 17 (citing *NYPIRG*, 249 F. Supp. 2d at 333–34).  The Court agrees that it is unclear how descriptions of meetings or advocacy in favor of language from other trade agreements would qualify as "commercial or financial."[14]  USTR has thus fallen short of establishing that the entirety of its § 2155(g)(1) and Exemption 4 withholdings are "commercial or financial" in nature.

The Court also has difficulty, based on USTR's submissions, concluding that all of these exemptions are "confidential" by virtue of "impairing the government's ability" to obtain necessary information in the future.  *Inner City Press*, 463 F.3d at 239.  First and foremost, USTR's declarations rely purely on conclusory statements from the agency itself, which simply proclaim that disclosure would complicate USTR's future efforts.  *See* Keppel Decl. ¶¶ 22, 33.  Even the sole piece of evidence meant to represent the views of actual private-sector actors comes from the agency's declaration, and this too is vague and conclusory.  *See id.* ¶ 33

---

[14] "To carry their burden, agencies…generally submit a *Vaughn* index, which is an itemized listing of the non-disclosed records, describing each record and portion withheld, and providing a detailed justification for the agency's withholding, specifying the [applicable] FOIA exemption." *Assadi v. U.S. Citizenship & Immigration Servs.*, No. 12-CV-1374 (RLE), 2014 WL 4804785, at *4 (S.D.N.Y. Sept. 26, 2014) (alteration in original) (citation and internal quotation marks omitted).  The Court notes that, here, USTR's initial *Vaughn* index consists only of nine numbered paragraphs in the Keppel Declaration, ¶¶ 29–37, which do not give any document-specific details with respect to ITAC Communications.  Nor do USTR's supplemental descriptions of ITAC Communications, Suppl. Keppel Decl. ¶¶ 3–9, provide any document-specific details.  USTR instead provides the Court only with broad generalizations that echo the statutory standards and provide no *detailed* justifications for the withholdings.

("[ITAC] members with whom we consulted about the possible release of communications advised that releasing the e-mails would complicate USTR's ability to solicit this information and advice in the future…."). "Such conclusory statements are insufficient to meet the Government's burden under Exemption 4." *NRDC*, 36 F. Supp. 3d at 406 (rejecting agency's confidentiality claim where declarations from private-sector actors merely stated that disclosure would make them reluctant to submit information in the future).[15] Critically, none of USTR's explanations are document-specific, nor even category-specific. They are blanket assertions meant to cover all withholdings made under § 2155(g)(1) and Exemption 4. *See Am. Civil Liberties Union v. Office of the Dir. of Nat. Intelligence* ("*ACLU*"), No. 10 Civ. 4419 (RJS), 2011 WL 5563520, at *5 (S.D.N.Y. Nov. 15, 2011) ("'[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not carry the government's burden.'") (quoting *Larson*, 565 F.3d at 864).

USTR also fails to respond to Plaintiffs' argument that the importance of trade negotiations and the value of participation on ITACs mean disclosure would not hamper the government's ability to obtain information from the private sector in the future. *See* Pls.' Br. 16. "A voluntary submitter may have sufficient external incentives to ensure continued government access to the desired information despite the prospect of public disclosure." *NYPIRG*, 249 F. Supp. 2d at 336; *see also NRDC*, 36 F. Supp. 3d at 406. Again, USTR's bare assertions reporting secondhand concerns from the private sector constitute only weak evidence, at best. *See NYPIRG*, 249 F. Supp. 2d at 336–37 (holding that agency did not "establish[] that concerns

---

[15] "[W]hile the submitter's subjective belief is important, it is not dispositive to a determination" of confidentiality. *NYPIRG*, 249 F. Supp. 2d at 336 (citing cases). What is required is an objective, specific explanation for why disclosure would deter future submissions of information. "Otherwise, the Exemption's requirement of objective confidentiality would be vitiated and replaced by a paltry requirement of subjective confidentiality, under which a private party that wished to withhold its information need only submit a declaration stating that an order compelling disclosure might lead it no longer to supply such information." *NRDC*, 36 F. Supp. 3d at 406.

about confidentiality outweigh the considerable external incentives to submit the analyses," where agency relied solely on its own speculation and failed to provide affidavits from the private-sector submitters themselves).

In addition to the conclusory nature of USTR's declarations, there are other aspects of the agency's response that cast doubt on the care and thoughtfulness with which the redactions were made. Despite its treating § 2155(g)(1) and Exemption 4 withholdings as coextensive, USTR inexplicably claims to withhold fourteen pages of documents under Exemption 4, but not Exemption 3. Gov't Br. 8.[16] Furthermore, in response to Plaintiffs' argument that the withheld commercial or financial information is not "confidential" because it has already been shared among all ITAC members, USTR argues only that ITAC members are sworn to secrecy and cannot use information they receive via ITACs outside of those committees. *See* Gov't Rep. 15. But the obvious reply, absent from USTR's briefs, is that USTR's own Operations Manual states that information subject to Exemption 4 withholding will be kept from other ITAC members. *See* Ops. Manual IV.4–5. As Plaintiffs argue, USTR's failure to make this simple response raises questions about whether the agency has wrongly withheld information under Exemption 4 that has already been shared with other ITAC members. *See* Pls.' Rep. 10 & n.11. Finally, although the Court does not question USTR's good faith in responding to this FOIA request, Plaintiffs are also correct to point out the troubling nature of USTR's first round of responsive disclosures here, which apparently withheld 149 pages in full and redacted portions of 413 pages improperly, despite sworn declarations attesting to a line-by-line review of all the documents.

---

[16] It is also possible, though the Court cannot tell for sure based on USTR's submissions, that there are redactions made under § 2155(g)(1), but not Exemption 4, which would also not make sense given the coterminous nature of these two exemptions.

*See* Pls.' Rep. 2.  USTR's identical sworn assurances made the second time around unfortunately carry less weight as a result.

**(iv) Exemption 3 (§ 2155(g)(2)–(3))**

USTR's explanations of its withholdings under § 2155(g)(2)–(3) are equally high-level and vague, and thus fare little better.  With respect to § 2155(g)(3), USTR describes the information only as "draft TPP text and negotiating proposals that USTR shared both via email and through postings to the Cleared Advisors' Secure Website for review by ITAC members…." Suppl. Keppel Decl. ¶ 7.  The remainder of USTR's description, although purporting to consist of examples "provided to ITAC members during the ongoing TPP negotiations," is merely a recital of the general categories of information USTR may provide ITACs during any negotiation, simply copy-and-pasted from the ITAC Operations Manual itself.  *Compare* Suppl. Keppel Decl. ¶ 7, *with* Ops. Manual VI.1–2.  This is insufficient to meet the government's burden of providing *specific* explanations for the withholding of *specific* documents.  *See ACLU*, 2011 WL 5563520, at *5.

Finally, while USTR's descriptions of its § 2155(g)(2) withholdings are the most plausible of the three, in that they at least passably describe confidential advice submitted by the private sector, Suppl. Keppel Decl. ¶ 6, the Court is nonetheless unable to judge the sufficiency of these withholdings based on the government's failure to detail its § 2155(g) withholdings section-by-section.

**(v) Exemption 3 and Exemption 4:  Additional Submissions Required**

"Absent a sufficiently specific explanation from an agency, a court's *de novo* review is not possible and the adversary process envisioned in FOIA litigation cannot function."  *Halpern v. FBI*, 181 F.3d 279, 295 (2d Cir. 1999).  "When faced with conclusory or otherwise insufficient

agency affidavits," the Court has "a number of options for eliciting further detail from the government." *ACLU*, 2011 WL 5563520, at *13 (quoting *Halpern*, 181 F.3d at 295).

While Plaintiffs request that the Court order *in camera* inspection of the documents themselves, Pls.' Rep. 1, the large volume of ITAC Communications cautions against that approach, at least at this stage.  *Cf. N.Y. Times Co.*, 872 F. Supp. 2d at 315; *see also ACLU*, 2011 WL 5563520, at *12 n. 9 ("*In camera* review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion.") (citation and internal quotation marks omitted).

Instead, the Court directs USTR to submit supplemental affidavits, declarations, and/or *Vaughn* indices in order to provide "a sufficient degree of detail" as to withholdings and redactions of ITAC Communications under Exemptions 3 and 4.  *Halpern*, 181 F.3d at 295; *see also Assadi v. U.S. Citizenship & Immigration Servs.*, No. 12-CV-1374 (RLE), 2014 WL 4804785, at *4 (S.D.N.Y. Sept. 26, 2014) ("To carry their burden, agencies also generally submit a *Vaughn* index, which is an *itemized* listing of the non-disclosed records, *describing each record and portion withheld*, and providing a *detailed justification* for the agency's withholding, *specifying* the [applicable] FOIA exemption.") (alteration in original) (emphasis added) (citation and internal quotation marks omitted).  "[T]he goal of the supplemental submissions is to…forc[e] the government to analyze carefully any material withheld" and "enabl[e] the trial court to fulfill its duty of ruling on the applicability of the exemption." *ACLU*, 2011 WL 5563520, at *13 (quoting *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987)). Based on USTR's supplemental submissions, the Court should be able to "make itemized findings, ideally with respect to specific documents or redactions, but at least at such a level of

detail as to permit effective *de novo* review, if required, in the future."  *Halpern*, 181 F.3d at 295.[17]

### (vi) Exemption 5:  ITAC Communications Are Not "Intra-Agency"

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party…in litigation with the agency."  5 U.S.C. § 552(b)(5).  "To qualify, a document must thus satisfy two conditions:  its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

USTR asserts that ITAC Communications are intra-agency communications subject to Exemption 5 withholding.  Gov't Rep. 20.  Normally, however, Exemption 5 "is not available to documents revealing an advisory committee's deliberative process because the exemption applies only to agencies," and advisory committees are not agencies.  *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 36 (D.D.C. 2006); *see also Wolfe v. Weinberger*, 403 F. Supp. 238, 242 (D.D.C. 1975) ("[A]n advisory committee cannot have a 'double identity' as an agency and thus cannot invoke [Exemption 5].").  Conceding as much, USTR instead invokes the "consultant corollary" to Exemption 5 to argue that, because ITACs serve as consultants to USTR, communications between the two are "intra-agency" and therefore exempt from disclosure under FOIA.  *See* Gov't Br. 22–23.

The Second Circuit "has recognized that agencies may require assistance from outside consultants in formulating policy," and with respect to Exemption 5 "has held that 'nothing turns on the point that…reports were prepared by outside consultants… rather than agency staff.'"

---

[17] USTR should also be sure to address the validity of Plaintiffs' argument that USTR cannot claim *any* § 2155(g)(3) withholdings because the ITAC Operations Manual was only put in place in March 2014.  *See* Pls.' Rep. 8.

*Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 77 (2d Cir. 2002) (quoting *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979)); *see also S.A. Ludsin & Co. v. U.S. Small Bus. Admin.*, No. 96 CV 5972, 1998 WL 355394, at *3 (E.D.N.Y. Apr. 2, 1998) ("Because agencies commonly need recommendations from hired consultants, courts have determined that documents generated outside the agency but created pursuant to the request of the agency qualify as inter-agency memoranda for purposes of Exemption 5.").  The Circuit has *not* advised on how far this corollary extends, however.  Specifically, the law in this Circuit is unsettled as to whether an outside consultant, not acting as pure objective proxy for the agency but rather advising expressly as an interested party meant to advocate for its own interests, qualifies for protection under the consultant corollary.  *See Klamath*, 532 U.S. at 10–11 ("[T]he fact about the consultant that is *constant* in the typical cases is that the consultant *does not represent an interest of its own*, or the interest of any other client, when it advises the agency that hires it.  Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant *functions just as an [agency] employee would be expected to do*.") (emphasis added).  At least one court in this district, while noting that the Second Circuit has yet to full adopt this rationale, applied it to withhold documents under Exemption 5 because the entity in question "functioned 'enough like' [the agency's] own personnel during these transactions 'to justify calling their communications 'intra-agency.''"  *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 739 F. Supp. 2d 515, 540 (S.D.N.Y. 2010) (quoting *Klamath*, 532 U.S. at 12); *id.* at 539 (noting the "absence of clear authority in this Circuit").

Rather than engage with this rationale, USTR argues only that it should not apply at all. *See* Gov't Br. 23 n.2 ("There is no basis in the statute to impose such a [disinterested-consultant]

requirement").[18]  The reason is that USTR recognizes that ITACs are *by definition* interested

parties who are expressly meant to advocate their own interests.  *See* Gov't Rep. 23 (conceding

that ITACs are not disinterested); *see also Autor v. Pritzker*, 740 F.3d 176, 178 (D.C. Cir. 2014)

("Unlike many advisory committees, ITACs exist for the very purpose of reflecting the

viewpoints of private industry….ITAC members serve in a representative capacity presenting the

views and interests of a U.S. entity or U.S. organization.") (citation and internal quotation marks

omitted).[19]  The upshot is that USTR asks this Court to apply an expansive interpretation of the

consultant corollary that the U.S. Supreme Court has described as beyond "typical" and the

Second Circuit has never expressly adopted.  The Court declines to do so, and thus grants

Plaintiffs' motion for summary judgment with respect to the applicability of Exemption 5 to the

ITAC Communications.

---

[18] In so arguing, USTR asks the Court to follow *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C. Cir. 1980).  The United States Supreme Court, however, explicitly described the consultants at issue in *Ryan* as extending "beyond… the typical examples" of the consultant corollary.  *See Klamath*, 532 U.S. at 12 n.4.

[19] USTR relies heavily on the D.C. Circuit's decision in *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 127–31 (D.C. Cir. 2005), to argue that communications between the Executive Office of the President (like USTR) and "statutorily created committees designed to aid the President" (like ITACs) are *per se* protected by Exemption 5, regardless of whether committee members are disinterested or not.  *See* Gov't Rep. 20–23.  But as Plaintiffs rightly point out, *Judicial Watch* held no such thing.  *See* Pls.' Rep. 11–12.  Rather, *Judicial Watch* tackled the question of whether deliberations by presidential advisors and other federal officials who formed an ad-hoc committee to advise the President on energy policy were properly protected under Exemption 5.  That case thus provides no persuasive authority for the question of whether advisory committees populated by private-sector representatives of industry and trade groups can engage in "intra-agency" deliberations when advocating their own private interests.

## IV. CONCLUSION

For the reasons stated above, the Court:

- GRANTS USTR's motion for summary judgment with respect to withholdings of Decision Memoranda (Category 1), ITAC Communications (Category 2), and Draft Chapters (Category 3) under Exemption 1;

- GRANTS Plaintiffs' motion for summary judgment with respect to withholdings of ITAC Communications under Exemption 5;

- DENIES both parties' motions for summary judgment with respect to withholdings of ITAC Communications under Exemptions 3 and 4; and

- ORDERS USTR to submit supplemental affidavits, declarations, and/or indices justifying in more detail its withholdings of ITAC Communications under Exemption 3 and Exemption 4 by **November 6, 2015**.

The parties are directed to appear for a status conference on **Friday, November 13, 2015, at 10:30 AM**. The Clerk is respectfully directed to terminate the parties' cross-motions for summary judgment, located at Doc. Nos. 42 and 48.

It is SO ORDERED.


Dated:     September 25, 2015
           New York, New York

                                        _____
                                        Edgardo Ramos, U.S.D.J.