USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED:  __8-31-2016__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTELLECTUAL PROPERTY WATCH and
WILLIAM NEW,

Plaintiffs,

- against -

UNITED STATES TRADE REPRESENTATIVE,

Defendant.

**OPINION AND ORDER**

13 Civ. 8955 (ER)

Ramos, D.J.:

This Freedom of Information Act ("FOIA") suit involves a request for draft text, memoranda, and communications relating to the Trans Pacific Partnership ("TPP"), a wide-ranging, multilateral trade agreement negotiated among the United States and eleven countries bordering both sides of the Pacific Ocean.[1]  Intellectual Property Watch, a news organization, and its editor-in-chief, William New (together, "Plaintiffs") submitted their FOIA request to the United States Trade Representative ("USTR" or the "agency"), and now challenge USTR's withholdings of certain responsive documents that the agency determined were exempt from FOIA's disclosure requirements.

On September 25, 2015, this Court upheld some of USTR's initial withholding determinations—including its withholdings of draft text of earlier iterations of the agreement—and further instructed USTR to submit additional information to justify other withholdings.  *See Intellectual Prop. Watch v. U.S. Trade Representative* ("*IP Watch I*"), 134 F. Supp. 3d 726

---

[1] The other eleven countries are:  Australia, Brunei Darussalam, Canada, Chile, Japan, Malaysia, Mexico, New Zealand, Peru, Singapore, and Vietnam.  Declaration of Barbara Weisel (Doc. 44) ¶ 5.

(S.D.N.Y. 2015).  USTR has made those additional submissions, and the parties now cross-move for summary judgment on the validity of the remaining withholdings.

Furthermore, at the time the Court decided *IP Watch I*, the final TPP text was still being negotiated among the twelve participating countries.  Since then, however, the twelve countries have agreed on and signed the final text of the agreement:  The final agreement was announced on October 5, 2015, the final text was published on November 5, 2015, and the TPP was signed by all twelve countries on February 4, 2016.[2]  At the time of writing, the agreement is being considered by the governments of the participating countries because, as explained further below, it requires ratification from a certain proportion of those countries in order to enter into force.  *See* Second Declaration of Jonathan Manes ("2d Manes Decl.") (Doc. 92), Exs. A, B; Second Supplemental Declaration of Barbara Weisel ("2d Supp. Weisel Decl.") (Doc. 98) ¶¶ 2, 23.  Given this change in circumstances since *IP Watch I*, Plaintiffs have moved for relief under Rule 60(b) of the Federal Rules of Civil Procedure, seeking reconsideration of the Court's initial judgment that draft TPP text containing proposals made by the United States could properly be withheld under an exemption to FOIA.  (Doc. 90).

For the reasons explained, summary judgment will not be granted in favor of either party at this time, because both sides deserve the opportunity to respond further to the Court's analysis below before the motions are resolved definitively.  Plaintiffs' Rule 60(b) motion for reconsideration is DENIED in substantial part, save for a small exception applicable to six particular documents.

---

[2] The full text is available on USTR's website:  https://ustr.gov/trade-agreements/free-trade-agreements/trans-pacific-partnership/tpp-full-text.

## I. BACKGROUND

### A. The TPP

The TPP is a wide-ranging trade agreement among twelve countries on both sides of the Pacific Ocean.  In addition to topics traditionally covered by trade agreements, such as tariffs and market access, the TPP sweeps far broader to cover nearly all spheres of commercial-related activity in the participating countries.  *See IP Watch I*, 134 F. Supp. 3d at 730–31; *The Trans Pacific Partnership* ("TPP"), OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, https://ustr.gov/trade-agreements/free-trade-agreements/trans-pacific-partnership/tpp-full-text (last visited July 29, 2016) (linking to TPP chapters on such topics as trade remedies, textiles, financial services, telecommunications, electronic commerce, state-owned enterprises, intellectual property, environment, labor, competition, and development).  The TPP chapters most relevant to this litigation are (i) Electronic Commerce, (ii) Trade Remedies, and (iii) Intellectual Property.  The ratification process, in which the domestic governments of the participating countries debate whether to assent to the final agreement, is currently underway.

The twelve participating TPP countries entered into a confidentiality agreement at the outset of negotiations, which stated as follows:

> [A]ll participants agree that the negotiating texts, proposals of each Government, accompanying explanatory material, emails related to the substance of the negotiations, and other information exchanged in the context of the negotiations, is provided and will be held in confidence, unless each participant involved in a communication subsequently agrees to its release.  This means that the documents may be provided only to (1) government officials or (2) persons outside government who participate in that government's domestic consultation process and who have a need to review or be advised of the information in these documents.  Anyone given access to the documents will be alerted that they cannot share the documents with people not authorized to see them.  All participants plan to hold these documents in confidence for four years after entry into force of the Trans Pacific Partnership Agreement, or if no agreement enters into force, for four years after the last round of negotiations.

Declaration of Barbara Weisel (Doc. 44) ¶ 11.

The TPP must be ratified by the domestic governments of the participating countries in order to enter into force.  Pursuant to Article 30.5 of the final text, the TPP will enter into force only (i) upon written notice from all twelve countries of the completion of their "applicable legal procedures" for ratification, or (ii) if unanimous notice has not been given within two years of the signing of the final agreement, upon notice of ratification from "at least six of the original signatories, which together account for at least 85 per cent of the combined gross domestic product of the original signatories in 2013."  *See* TPP Art. 30.5, *available at* https://ustr.gov/sites/default/files/TPP-Final-Text-Final-Provisions.pdf.[3]

As the last sentence of the confidentiality agreement makes clear, the agreement terminates only upon the TPP's entry into force (or the breakdown of negotiations).  The confidentiality agreement thus continues to remain operative despite the fact that participating countries agreed to and signed the final text.

**B. Industry Trade Advisory Committees**

The Trade Act of 1974 (the "Trade Act") requires the President to "seek information and advice from representative elements of the private sector and the non-Federal governmental sector" regarding trade negotiations and policy.  19 U.S.C. § 2155(a).  The Act authorizes the President to establish industry-specific advisory committees, populated by representative members of key sectors and groups of the economy affected by trade policy.  *See* § 2155(c).  The result is a system of "industry trade advisory committees" ("ITACs") that are dedicated to

---

[3] More specifically, if six participating countries constituting 85% of aggregate GDP of the twelve countries give written notice of ratification *within* the two-year period following the signing of the final agreement, the TPP will enter into force sixty days after the expiration of that two-year period.  *See* TPP Art. 30.5(2).  If six such countries have not given notice within the two-year period, the TPP will enter into force sixty days following the date on which six such countries do provide that notice.  *See* TPP Art. 30.5(3).

different sectors of the economy and are comprised of members from the private sector who "provide policy advice, technical advice and information, and advice on other factors" relevant to trade negotiations. § 2155(d). Among the disputed documents at issue here are communications sent among ITAC members, USTR, and other private sector actors, discussing various issues related to TPP negotiations, both via email and via a secured website, the "Cleared Advisor" website, which is essentially a message board that serves as a forum for ITAC members to communicate with USTR. *See IP Watch I*, 134 F. Supp. 3d at 731–32.

Section 2155(g) of the Trade Act governs confidential communications among ITAC members, other private-sector actors, and the U.S. government. 19 U.S.C. § 2155(g). Because the provision's precise language is important to the resolution of this case, section § 2155(g) is reproduced in pertinent part below:

**(g) Trade secrets and confidential information**

(1) Trade secrets and commercial or financial information which is privileged or confidential, and which is submitted in confidence by the private sector or non-Federal government to officers or employees of the United States in connection with trade negotiations, may be disclosed upon request to—[(A) U.S. government officials designated by USTR; (B)–(C) certain designated members of Congress and congressional staffers]—for use in connection with matters referred to in subsection (a) of this section.[4]

(2) Information other than that described in paragraph (1), and advice submitted in confidence by the private sector or non-Federal government to officers or employees of the United States, to the Advisory Committee for Trade Policy and Negotiations, or to any advisory committee established under subsection (c) of this section, in connection with matters referred to in subsection (a) of this section, may be disclosed upon request to—[the individuals described in (g)(1), plus other ITAC members]

(3) Information submitted in confidence by officers or employees of the United States to the Advisory Committee for Trade Policy and Negotiations, or to any [ITAC established under this section], may be disclosed in accordance with rules issued by the United States Trade Representative and the Secretaries of Commerce, Labor, Defense, Agriculture, or other executive departments, as appropriate, after consultation with the relevant [ITACs].

---

[4] Section 2155(a) instructs the President to seek information and advice from, and to consult with, "representative elements of the private sector and the non-Federal governmental sector" with respect to U.S. trade agreements, objectives, negotiations, and policy.

Such rules shall define the categories of information which require restricted or confidential handling by such committee considering the extent to which public disclosure of such information can reasonably be expected to prejudice the development of trade policy, priorities, or United States negotiating objectives.  Such rules shall, to the maximum extent feasible, permit meaningful consultations by advisory committee members with persons affected by matters referred to in subsection (a) of this section.

**C. Plaintiffs' FOIA Request and *IP Watch I***

*IP Watch I* lays out the history of this litigation in more detail.  *See* 134 F. Supp. 3d at 732–34.  What follows is a condensed summary:

Plaintiffs submitted their initial FOIA request on March 23, 2012, seeking, among other things, draft text of TPP provisions related to intellectual property, U.S. negotiation positions regarding intellectual property, and communications between USTR and ITACs 3, 8, 10, and 15.[5]  USTR withheld all responsive documents save for some partial disclosures of communications between USTR and ITACs.  After Plaintiffs filed suit in this Court on December 18, 2013, the parties entered into a joint stipulation pursuant to which USTR would undertake searches for a representative sample set of documents using search terms proffered by Plaintiffs, which would then provide the exclusive basis for the litigation going forward.  The sample set consisted of three categories of documents, and USTR's searches produced the following documents:

**Category 1 ("Decision Memoranda"):**  Two USTR-drafted memoranda summarizing and assessing the negotiations, and providing strategic advice on various issues.  The documents are titled "Decision Memoranda on Addressing Trade Remedies–Related Proposals in TPP," and "Decision Memoranda on TPP Copyright Parallel Import Proposal."

**Category 2 ("ITAC Communications"):**  Roughly 700 pages of emails among USTR and ITAC members and forty-one pages of postings to the government's Cleared Advisor site, all of which were identified as a result of search terms provided by Plaintiffs.

---

[5] ITAC–3 covers Chemicals, Pharmaceuticals, Health-Science Products and Services.  ITAC–8 covers Information and Communications Technologies, Services, and Electronic Commerce.  ITAC–10 covers Services and Financial Industries.  ITAC–15 covers Intellectual Property Rights.

**Category 3 ("Draft Chapters"):**  Twenty-one documents containing draft text
and comments related to draft TPP chapters on intellectual property rights,
electronic commerce, and trade remedies.

USTR withheld the Decision Memoranda and Draft Chapters in full pursuant to multiple

exemptions from FOIA's disclosure requirements, and withheld some ITAC Communications in

full and some only partially by disclosing redacted versions.  The parties cross-moved for

summary judgment on the validity of USTR's withholdings.

*IP Watch I* was decided on September 25, 2015.  This Court upheld USTR's

withholdings of Decision Memoranda, Draft Chapters, and some ITAC Communications

pursuant to FOIA Exemption 1 (5 U.S.C. § 552(b)(1)), which exempts from FOIA information

that is properly classified pursuant to an Executive Order.  *IP Watch I*, 134 F. Supp. 3d at 736–

39.  Regarding the remaining ITAC Communications, USTR invoked FOIA Exemption 3 (§

552(b)(3)), covering information specifically authorized to be withheld by statute, FOIA

Exemption 4 (§ 552(b)(4)), covering trade secrets and confidential commercial information, and

FOIA Exemption 5 (§ 552(b)(5)), covering intra-agency documents that would be traditionally

privileged in civil litigation.  The Court rejected USTR's use of Exemption 5, holding that

communications among ITACs and U.S. officials were not "intra-agency."  *IP Watch I*, 134 F.

Supp. 3d at 747–49.  Additionally, although the Court held that the provision of the Trade Act

governing ITAC Communications, 19 U.S.C. § 2155(g), served as a withholding statute for

purposes of Exemption 3, USTR has not provided sufficient evidence to sustain its burden of

withholding documents under either Exemption 3 or Exemption 4.  Thus, the Court requested

from USTR more detailed and document-specific justifications for the agency's withholdings

under those two FOIA exemptions.  *IP Watch I*, 134 F. Supp. 3d at 739–47.

### D. New Submissions and Outstanding Issues

In response to the concerns expressed in *IP Watch I*, USTR made the following additional submissions in November and December of 2015 to support withholdings made under FOIA Exemption 3:  (1) an index with 126 entries, listing the date, sender(s), recipient(s), subject lines, and withholding justifications for ITAC Communications submitted via email (Doc. 78, Ex. 1); (2) an index with 29 entries, listing the date, submitter, and withholding justifications for ITAC Communications submitted via the Clear Advisor website (Doc. 71, Ex. 2); (3) a copy of the agency manual outlining the operations of the ITACs that was in effect at the time of the ITAC Communications at issue here (Doc. 72, Ex. 1); (4–5) the declarations of two ITAC Cleared Advisors, who submitted certain ITAC Communications as members of, respectively, ITAC-3 on Chemicals, Pharmaceuticals, and Health-Science Products and Services, and ITAC-8 on Information and Communications Technologies, Services, and Electronic Commerce (Docs. 74–75); (6) the declarations of the Assistant U.S. Trade Representative for Intergovernmental Affairs and Public Engagement and the Director of the Industry Trade Advisory Center, who both manage the relationship between USTR and ITACs (Docs. 73, 88); and (7) the declaration of a lawyer in USTR's Office of General Counsel and now Acting Assistant U.S. Trade Representative for Intellectual Property and Innovation, who was a negotiator on IP issues during TPP negotiations (Doc. 86).

USTR has withdrawn its reliance on FOIA Exemption 4, and thus relies exclusively on Exemption 3 to justify withholdings of ITAC Communications.  USTR Letter (Doc. 70) at 3 n.3.

As previously noted, the twelve TPP countries signed the final agreement on February 4, 2016.  On February 15, 2016, Plaintiffs moved under Rule 60(b) of the Federal Rules of Civil Procedure, seeking reconsideration of the Court's affirmance of the withholdings USTR made

under Exemption 1.  (Doc. 90).  Plaintiffs urge reconsideration because the Court's reasoning in *IP Watch I* turned in part on the fact that TPP negotiations were still ongoing.

Thus, the Court is now presented with the following issues:  (1) Whether USTR has sustained its burden on summary judgment to prove the applicability of FOIA Exemption 3 to withheld ITAC Communications, and (2) whether Plaintiffs are entitled to relief under Rule 60(b) because the signing of the final TPP agreement fatally undercuts USTR's justifications for its Exemption 1 withholdings.

## II. SUMMARY JUDGMENT ON USTR'S EXEMPTION 3 WITHHOLDINGS

FOIA generally requires agencies to disclose information in its custody unless that information "is exempted under clearly delineated statutory language."  *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (citation omitted).  "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure."  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009).  The Court "decides *de novo* whether the agency has sustained its burden" to justify particular withholdings.  *Bloomberg, L.P.*, 601 F.3d at 147 (citations omitted).

FOIA cases are generally resolved by cross-motions for summary judgment.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 73 F. Supp. 3d 350, 355 (S.D.N.Y. 2014) (citation omitted).  "'[S]ummary judgment in favor of the FOIA plaintiff' is appropriate '[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption,' but should be denied if the agency satisfies its burden 'to show that requested material falls within a FOIA exemption.'"  *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976

F.2d 1429, 1433 (D.C. Cir. 1992)).  Agencies can prevail on summary judgment by submitting affidavits that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Wilner*, 592 F.3d at 73 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

FOIA Exemption 3 applies to matters "specifically exempted from disclosure by statute," where that statute either "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. §§ 552(b)(3)(A).  "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Am. Civil Liberties Union v. F.B.I.*, 59 F. Supp. 3d 584, 594 (S.D.N.Y. 2014) (quoting *Wilner*, 592 F.3d at 72).

### A. Information "Submitted in Confidence" under Sections 2155(g)(2) and (g)(3)

In *IP Watch I*, this Court held that section 2155(g) of the Trade Act served as a withholding statute for purposes of FOIA Exemption 3.  Specifically, while the provision used to contain a clear prohibition on disclosure ("shall not disclose") and was thus undisputedly a withholding statute in its prior iteration, Congress's amendment replacing that language with the current, discretionary "may be disclosed upon request" language did *not* alter the provision's status as a withholding statute.  There was no legislative history indicating such a change, and it would make no sense for Congress to simply single out a few entities to which information and advice "may be disclosed upon request" if there was no withholding authority in place to begin with.  Thus, the Court held that section 2155(g), entitled "Trade secrets and confidential

information," continued to serve as a withholding statute by requiring withholding of information and advice *already deemed* a "trade secret" or "confidential," and by singling out the *exclusive* entities to which the information and advice "may be disclosed upon request." *See IP Watch I*, 134 F. Supp. 3d at 741–43.

What *IP Watch I* did not expressly address, and what the parties continue to dispute here, is the operative definition of "confidential." Plaintiffs insist that the subjective belief of the submitter—whether it be an ITAC member, a non-member in the private sector, or the federal government—cannot alone determine the "confidential" status of information or advice. Plaintiffs' Response to Defendant's Supplemental Submissions ("Pl. Br.") (Doc. 81) at 9. Instead, Plaintiffs seek to import one of the definitions of "confidential" used to determine whether a piece of information is a trade secret and thus properly withheld under FOIA Exemption 4 or § 2155(g)(1)—namely, whether disclosure would impair the government's ability to obtain necessary information from third-party sources in the future. *Id.* at 9–10.[6]

The Court declines to adopt Plaintiffs' interpretation. Section 2155(g)(1) applies to "[t]rade secrets and commercial or financial information" that is *both* "privileged or confidential" *and* "submitted in confidence," indicating that objective confidentiality and the parties' contemporaneous, subjective expectations of confidentiality are conceptually distinct requirements. Sections 2155(g)(2) and (g)(3), notably, refer only to information or advice "submitted in confidence."

---

[6] For FOIA Exemption 4 to apply, the withheld information (1) "must be a 'trade secret' or 'commercial or financial' in character," (2) "must be 'obtained from a person,' " and (3) "must be 'privileged or confidential.'" *Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir. 2006) (quoting *Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996); 5 U.S.C. § 552(b)(4)). Information is "is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information-necessary information-in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'" *Id.* (quoting *Cont'l Stock Transfer & Trust Co. v. SEC*, 566 F.2d 373, 375 (2d Cir. 1977)).

In addition to the plain text, it would be structurally odd for Congress to integrate the trade-secret "confidentiality" test in § 2155(g)(1) and then create another provision that simply reiterates a subset of that test.  *See IP Watch I*, 134 F. Supp. 3d at 743 (treating § 2155(g)(1) as coextensive with FOIA Exemption 4.  Indeed, the Senate Finance Committee's report on the original Trade Act of 1974 strongly implies that Congress thought it was creating a new FOIA exemption in (g)(2), but *not* in (g)(1), so it makes little sense to interpret (g)(2) in a manner that leaves it essentially subsumed by (g)(1).  *See* S. Rep. No. 93-1298 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7186, 7251 (noting that the provision codified at § 2155(g)(2) would create a "limited statutory exemption" to FOIA, but not making a similar statement about the provision codified at § 2155(g)(1)).[7]

It is more reasonable to interpret sections 2155(g)(2) and (g)(3) to authorize withholding of information or advice "submitted in confidence," and to determine whether a document is properly withheld by asking whether the information or advice contained therein was submitted with the expectation that it would be treated confidentially.  The operative test for whether information or advice can be withheld under sections 2155(g)(2) and (g)(3), therefore, is whether the submitter "provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred."  *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 486 (2d Cir. 1999) (quoting *U.S. Dep't of Justice v. Landano*, 508

---

[7] As the Court noted in *IP Watch I*, 134 F. Supp. 3d at 740 n.9, the likely reason the report did not describe the provision codified at section 2155(g)(1) as one creating a new FOIA exemption is that the provision was essentially coextensive with FOIA Exemption 4.  *Cf.* Declaration of Ingrid Mitchem ("Mitchem Decl.") (Doc. 72), Ex. A ("Manual") VI.4–5 (notifying ITAC members that USTR would use the standard analysis under FOIA Exemption 4 to determine whether (g)(1) or (g)(2) would apply to confidential information communicated from the private sector to USTR).  Additionally, the Court notes that the Senate version of the provision in question, as described in the Senate Finance Committee report, was ultimately the version adopted by the whole Congress.  *See* H.R. Conf. Rep. No. 93-1644 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7367, 7376 (noting that the House receded to the Senate version of the provision).

U.S. 165, 172 (1993)); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011).

There are multiple reasons to favor this interpretation, which is adopted from the well-established test governing FOIA Exemption 7(D), exempting information submitted to law enforcement that could reveal the identity of a confidential source. *See* 5 U.S.C. § 552(b)(7)(D); *Landano*, 508 U.S. at 172; *Halpern v. F.B.I.*, 181 F.3d 279, 298–99 (2d Cir. 1999).[8]

First, as previously noted, the text of the provisions refer only to information or advice "submitted in confidence," which compels a test that is tethered to the subjective understanding between the submitter and receiver, rather than an independent judicial assessment of whether the information communicated is objectively confidential.

Second, this interpretation is the best fit with the Court's construction of section 2155(g) as a withholding statute, because it provides the most natural sense in which the provision authorizes withholding of information or advice "already deemed" confidential—the submitter was given an express or implied assurance of confidentiality prior to submission, and USTR "may disclose" the information or advice "submitted in confidence" only to a limited number of other parties.

Third, federal courts in the District of Columbia have applied this test of confidentiality to a nearly identical provision governing the creation of the Cultural Property Advisory Committee ("CPAC"), as part of the Convention on Cultural Property Implementation Act. *See* 19 U.S.C. §§ 2605. Like ITACs, the CPAC is a federal advisory committee statutorily

---

[8] Under FOIA Exemption 7(D), "the Government may withhold 'records or information' that are (1) 'compiled for law enforcement purposes' that (2) 'could reasonably be expected to disclose the identity of a confidential source....'" *Adamowicz v. I.R.S.*, 552 F. Supp. 2d 355, 370 (S.D.N.Y. 2008) (quoting 5 U.S.C. § 552(b)(7)(D). "To invoke this exemption, the Government must show, not that the document withheld is confidential, but rather that the person who provided the information did so 'under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *Id.* (quoting *Landano*, 508 U.S. at 172).

constituted to advise the Executive Branch—in this case, the State Department's Undersecretary for Educational and Cultural Affairs—on import-restriction requests from foreign governments made in the course of negotiations over multilateral agreements governing cultural artifacts.  *See* 19 U.S.C. §§ 2602, 2605; *Ancient Coin Collectors Guild*, 641 F.3d at 509.  The CPAC statute includes a provision, entitled "Confidential information," that closely tracks the equivalent ITAC provisions in the Trade Act, most pertinently by referring only to information "submitted in confidence" by the private sector or government employees.  *See* 19 U.S.C. § 2605(i).[9]  In a FOIA case brought against the State Department seeking communications from the private sector, the State Department invoked Exemption 3 and, because the parties agreed, both the district court and the Court of Appeals applied the test the Court adopts here—*i.e.*, the test to determine withholdings under FOIA Exemption 7(D), established by the United States Supreme Court in *U.S. Dep't of Justice v. Landano*, 508 U.S. 165 (1993)—for determining whether information was "submitted in confidence" and thus properly withheld under the statute.  *Ancient Coin Collectors Guild*, 641 F.3d at 511–12; *Ancient Coin Collectors Guild v. U.S. Dep't of State*,

---

[9] As noted in *IP Watch I*, 134 F. Supp. 3d at 740 n.11, the CPAC provisions contain the "shall not be disclosed" language that was originally in section 2155(g) before Congress tweaked the latter's language.  Beyond that small wrinkle, section 2605(i)(1) of the CPAC closely tracks sections 2155(g)(1) and (g)(2) of the Trade Act, stating as follows:

> Any information (including trade secrets and commercial or financial information which is privileged or confidential) submitted in confidence by the private sector to officers or employees of the United States or to the Committee in connection with the responsibilities of the Committee shall not be disclosed to any person other than to [certain government employees and CPAC members].

Section 2605(i)(2) of the CPAC likewise tracks section 2155(g)(3) of the Trade Act, stating as follows:

> Information submitted in confidence by officers or employees of the United States to the Committee shall not be disclosed other than in accordance with rules issued by the Director of the United States Information Agency, after consultation with the Committee.  Such rules shall define the categories of information which require restricted or confidential handling by such Committee considering the extent to which public disclosure of such information can reasonably be expected to prejudice the interests of the United States.  Such rules shall, to the maximum extent feasible, permit meaningful consultations by Committee members with persons affected by proposed agreements authorized by this chapter.

866 F. Supp. 2d 28, 31–32 (D.D.C. 2012) ("The parties agree that 19 U.S.C. § 2605(i)(1) is a withholding statute for the purposes of FOIA Exemption 3(b) and that the proper standard for analyzing confidentiality is the same as that for FOIA Exemption 7(D)."). Where the relevant question is whether information was submitted in confidence—as it is in the 7(D) context, the CPAC context, and the ITAC context here—this Court agrees with the two *Ancient Coin Collectors Guild* courts that *Landano* provides a workable standard.

Fourth, a standard guided by contemporaneous expectations best serves the statutory purpose of "insur[ing] maximum participation by the private sector in [trade] negotiations." S. Rep. No. 93-1298; *see also id.* ("[T]he private sector of our economy must be given a much larger role in providing information to our negotiators and assessing the merits of an agreement than has ever been provided in the past….[T]hose affected most by such agreements should be able to consult closely with and provide vital information to the negotiators and in turn should be consulted on a regular basis by the negotiators."). Participation by private sector actors is better assured by empowering them to request and receive assurances of confidentiality up front, because it removes the possibility that a court may come to a different conclusion and disclose information regardless. The same is true of communications to ITAC members submitted in confidence by the government.

Fifth, USTR itself adopts this expectation-based standard in the agency manual interpreting section 2155(g), and that interpretation is entitled to some deference to the extent the Court finds it persuasive. *See, e.g.*, *Barrows v. Burwell*, 777 F.3d 106, 109 n.6 (2d Cir. 2015) ("[U]nder so-called 'Skidmore deference,' we give effect to an agency's non-legislative interpretation of a statute 'to the extent we find it persuasive.'") (quoting *Estate of Landers v. Leavitt*, 545 F.3d 98, 105 (2d Cir. 2008)). The persuasiveness of an agency's non-legislative

15

interpretation is determined by "the thoroughness evident in [the agency's] consideration, the

validity of its reasoning, its consistency with earlier and later pronouncements, and all those

factors which give it power to persuade." *Estate of Landers*, 545 F.3d at 107 (quoting *United*

*States v. Mead Corp.*, 533 U.S. 218, 228 (2001)) (internal quotation marks omitted).  In the

operations manual promulgated by USTR to facilitate the functioning of the ITACs (the "ITAC

Manual"), the sections discussing confidential information focus on the subjective expectation of

the submitter.  *See* Declaration of Ingrid Mitchem ("Mitchem Decl.") (Doc. 72), Ex. A

("Manual") at VI.1 (noting that information "provided in confidence by the U.S. Government to

Committee members will in general be clearly designated" as being either security-classified or

trade-sensitive); *id.* at VI.4 (instructing ITAC members providing information "that they believe

is sensitive" to "clearly indicate that the material is submitted in confidence," and noting that

USTR will determine only whether to withhold that information from other ITAC members, not

whether the information is objectively confidential).  Although USTR does not provide explicit

or exhaustive reasoning, the agency's interpretation is at least entitled to a modicum of deference

based on the consistency with which USTR has abided by it.  *Compare* Mitchem Decl. ¶ 4 & Ex.

A (demonstrating that ITAC Manual operative from 2010 to 2014 employed the interpretation),

*with IP Watch I*, 134 F. Supp. 3d at 742 (citing post-2014 iteration of ITAC Manual for same

proposition; *see also Fishman v. Daines*, No. 09 Civ. 5248 (JFB), 2016 WL 853174, at *6

(E.D.N.Y. Mar. 4, 2016) ("Such consistency over time…weighs in favor of treating the Manual

with deference.") (citations omitted).

　　While *IP Watch I* made it clear that the touchstone for withholding under sections

2155(g)(2) and (g)(3) was whether the submission of the information was made in confidence, it

is only in the instant opinion that the Court is expressly adopting the evidentiary standard from

*Landano* and its progeny.  As a result, the parties deserve an opportunity to further brief the issue

of whether USTR's declarations and *Vaughn* indices establish that the withheld documents

contain information or advice "submitted in confidence."  Both parties are free to submit

additional declarations or other evidence, as well.  *See Houghton v. U.S. Dep't of State*, 875 F.

Supp. 2d 22, 32 n.4 (D.D.C. 2012) ("[T]he government is not entitled to a blanket presumption

that [submissions were made] under a commitment to confidentiality.  Instead, an agency must

present evidence showing that information was submitted in confidence, such as notations on the

face of a withheld document, the personal knowledge of an official familiar with the source a

statement by the source or contemporaneous documents discussing practices or policies for

dealing with the source or similarly situated sources.") (citing *Ancient Coin Collectors Guild*,

641 F.3d at 511; *Campbell v. DOJ*, 164 F.3d 20, 34 (D.C. Cir. 1998)) (internal quotation marks

omitted).

The Court does not pass judgment at this time as to whether the evidence already

submitted by ITAC members and USTR officials justifies withholding some or all ITAC

Communications, and USTR naturally is free to rely on and refer to the voluminous submissions

already made to sustain its case.  (Docs. 71–75, 78, 86, 88).  But if the parties do opt to submit

additional briefing and/or evidence, the Court would appreciate a focus on (1) the basis for

USTR's repeated assertion in the *Vaughn* index that ITAC emails were submitted in

confidence,[10] (2) potential probative evidence (whether already submitted or not) indicating the

---

[10] *Cf. Ancient Coin Collectors Guild*, 641 F.3d at 512 ("[A] declaration simply asserting that a source received express assurances of confidentiality 'without providing any basis for the declarant's knowledge of this alleged fact' does not [satisfy the government's burden].") (quoting *Campbell*, 164 F.3d at 34–35); *Halpern*, 181 F.3d at 299 ("Nothing in the [agency] Declaration provides the type of proof required under this standard.  Rather, the Declaration relies on bare assertions that express assurances were given to the sources in question, and that the information received was treated in a confidential manner during and subsequent to its receipt.  Clearly this is insufficient to prove an express grant of confidentiality.").

existence or absence of assurances of confidentiality,[11] and (3) the extent to which the presence

of private-sector, non-ITAC members on email chains affects the "submitted in confidence"

analysis under both sections 2155(g)(2) and (g)(3).[12]  The Court reiterates that it will not

consider arguments that rely on objective indicia of confidentiality tethered to speculative or

non-contemporaneous factual circumstances.[13]

### B. USTR's Reliance on the ITAC Manual

One issue the Court can resolve at this juncture is in response to Plaintiffs' three

objections to USTR's reliance on the ITAC Manual for withholdings made under section

2155(g)(3).

Plaintiffs first argue that the ITAC Manual does not sufficiently "define the categories of

information which require restricted or confidential handling," as section 2155(g)(3) requires of

the "rules" governing disclosure of information submitted in confidence by the United States.

*See* Pl. Br. at 12.  But the ITAC Manual does categorize information submitted by the U.S. into

two groups—"Security-Classified Information" and "Trade-Sensitive Information"—providing

---

[11] *Cf. Halpern*, 181 F.3d at 298–299 (discussing potential probative evidence that a submitter "did in fact receive an express promise of confidentiality," including affidavits attesting that assurances were made or are set forth in the documents themselves, contemporaneous documents reflecting express assurances, or evidence of a "consistent policy" of granting confidentiality) (citing *Ferguson v. FBI*, 83 F.3d 41, 42–43 (2d Cir. 1996); *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1061 (3d Cir. 1995)); *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 527–28 (S.D.N.Y. 2010) (upholding Exemption 7(D) withholding based on express and implied assurances of confidentiality made in agency regulation); *Adamowicz v. I.R.S.*, 672 F. Supp. 2d 454, 475–76 (S.D.N.Y. 2009) ("Where an agency relies on an express assurance of confidentiality…it must offer probative evidence that the source did in fact receive an express grant of confidentiality…, such as…an official's personal knowledge about the source….") (quoting *Dipietro v. Exec. Office for United States Att'ys*, 357 F. Supp. 2d 177, 185 (D.D.C. 2004) (internal quotation marks omitted), *aff'd*, 402 F. App'x 648 (2d Cir. 2010).

[12] *See* Pl. Br. at 8–9, 13–14; *cf. Adamowicz v. I.R.S.*, 402 F. App'x 648, 653 (2d Cir. 2010) (holding that inadvertent disclosures by agency did not vitiate confidentiality because "the promised confidentiality could only be waived by the source") (citing *Ferguson*, 957 F.2d at 1068; *United Techs. Corp. v. NLRB*, 777 F.2d 90, 96 (2d Cir. 1985) ("The privilege belongs to the beneficiary of the promise of confidentiality and continues until he or she waives it.")).

[13] *Cf. Halpern*, 181 F.3d at 300 ("[I]t makes no difference in our analysis whether now, in hindsight, the objective need for confidentiality has diminished; what counts is whether then, at the time the source communicated with [the agency], the source understood that confidentiality would attach.").

assurances that information provided will be "clearly designated as falling into" one of the two

categories, and guidance as to what constitutes those two categories, examples of the types of

information likely to be communicated, the extent to which the categories can be shared with

non-ITAC members, how the different categories will be communicated, and how they should be

handled from a security standpoint.  *See* Manual at VI.1–3.  Since Plaintiffs offer no benchmark

or authority for what "sufficient" categorization would look like, and USTR is owed at least

"some deference" in interpreting what the statutory provision requires of an agency manual,

*Kuhne v. Cohen & Slamowitz, LLP*, No. 07 Civ. 1364 (HB), 2008 WL 608607, at *4 (S.D.N.Y.

Mar. 5, 2008), the ITAC Manual meets the categorization requirement set forth in § 2155(g)(3).

Plaintiffs next maintain that the ITAC Manual is illegitimate because it was not

promulgated under the Administrative Procedure Act's notice-and-comment requirements.  Pl.

Br. at 12–13.  "Except when notice or hearing is required by statute," the Administrative

Procedure Act (the "APA") does not require formal notice-and-comment procedures when

agencies promulgate "interpretative rules, general statements of policy, or rules of agency

organization, procedure, or practice."  5 U.S.C. § 553(b)(A).  The ITAC Manual is plainly

interpretative in nature, as it creates no new legal rights, and does no more than explicate and

clarify agency procedure with regard to a substantive duty already set forth in section 2155(g)(3).

*See, e.g.*, *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) ("[T]he critical feature

of interpretive rules is that they are 'issued by an agency to advise the public of the agency's

construction of the statutes and rules which it administers.'") (quoting *Shalala v. Guernsey

Mem'l Hosp.*, 514 U.S. 87, 99 (1995)); *Cohn v. Fed. Bureau of Prisons*, 302 F. Supp. 2d 267,

274 (S.D.N.Y. 2004) ("A rule is interpretive if 'an agency is exercising its rule-making power to

clarify an existing statute or regulation,' and substantive if the agency is seeking to 'create new

19

law, rights or duties in what amounts to a legislative act.'") (quoting *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993)).  Plaintiffs do not attempt to argue why the ITAC Manual is substantive and not interpretative, begging the question by simply assuming that notice-and-comment procedures are required.  This objection to the ITAC Manual is thus rejected.

Finally, Plaintiffs argue that USTR cannot rely on the ITAC Manual because it was not made available to the public during the time period covered by the ITAC Communications.  Pl. Br. at 13 (citing 5 U.S.C. § 552(a)(2)(E)).  USTR, however, has submitted a sworn declaration from the official who has managed the ITACs since 2000, attesting that the ITAC Manual "has been published online since October 2010, and was otherwise available to the public for inspection and copying since its creation in 2004."  Supplemental Declaration of Ingrid Mitchem (Doc. 88) ¶ 4.  The Court credits that representation.  Plaintiffs' final challenge to the ITAC Manual is therefore also rejected.

### C. Section 2155(g)(2)'s Application to Submissions by ITAC Members

*IP Watch I* implicitly rejected Plaintiffs' argument that section 2155(g)(2) applies only to information from private individuals who are not ITAC members, and thus does not authorize withholding of *any* information submitted by ITAC members in confidence.  *See* Pl. Br. at 7 n.1. The Court now makes that rejection explicit:  Section 2155(g)(2) covers information submitted in confidence by ITAC members to the U.S. government.

Section 2155(g)(2) governs "advice submitted in confidence by the private sector or non-Federal government," and the remainder of the statue makes clear what is meant by "the private sector."  Section 2155(a), the general provision demonstrating the purpose of the statute, instructs the President to seek information and advice from, and to consult with, "representative elements of the private sector and the non-Federal governmental sector" with regards to U.S.

trade policy and negotiations.  Section 2155(c) authorizes creation of the ITACs "to provide general policy advice on matters referred to in subsection (a) of this section."  Thus, ITAC members are among the "elements of the private sector" referred to in section 2155(a), and are thus permitted to submit information in confidence under section 2155(g)(2).  And beyond the plain language, Plaintiffs' interpretation borders on the absurd—there is no rational explanation for why Congress would create ITACs specifically to advise the government on trade negotiations but not permit ITAC members to submit information or advice in confidence, even though non-ITAC members can submit in confidence to ITACs and USTR, and USTR can submit in confidence to ITACs.  *See* USTR Response (Doc. 85) at 4 ("Under this interpretation, the statute would *not* cover confidential information or advice that ITAC members submitted to USTR.  This runs directly counter to the purpose of the Trade Act….").

### D. Conclusion on the Summary Judgment Motions

The Court will not grant summary judgment in favor of either party at this time.

Should USTR want to make additional submissions to support its Exemption 3 withholdings, it must do so on or before **September 30, 2016**.  Plaintiffs must submit a response to those submissions on or before **October 31, 2016**.  USTR is permitted, but not required, to file a reply on or before **November 14, 2016**.

### III. PLAINTIFFS' RULE 60(B) MOTION

Based on the conclusion of TPP negotiations and the release of the final agreement, Plaintiffs have moved the Court to revisit its decision in *IP Watch I* and "order disclosure of the draft texts (and other materials) to the extent they reflect TPP positions advanced or adopted by the U.S. government."  Memorandum of Law in Support of Plaintiffs' Motion for Relief

Purusant to Rule 60(b) ("Pl. 60 Br.") (Doc. 91) at 2.  As explained below, that motion is denied in substantial part, save for a small set of withholdings of ITAC Communications that USTR has not justified under Exemption 1.

Rule 60(b)(6) authorizes the Court to relieve a party from a final judgment or order for "any" reason that "justifies relief" and is not covered by the grounds for relief provided by Rules 60(b)(1)–(5).  "Rule 60(b)(6) 'confers broad discretion on the trial court to grant relief when appropriate to accomplish justice.'"  *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009) (quoting *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir. 1986)).  "Relief is warranted 'where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served.'"  *Id.* (quoting *Matarese*, 801 F.2d at 106)).

### A. "Extraordinary Circumstances" Required for Rule 60(b)(6) Relief

As a preliminary matter, Plaintiffs have arguably not satisfied the threshold showing of "extraordinary circumstances" required to garner reconsideration under Rule 60(b)(6).  *See, e.g.*, *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005) ("[O]ur cases have required a movant seeking relief under Rule 60(b)(6) to show 'extraordinary circumstances' justifying the reopening of a final judgment.") (citations omitted); *Justice v. City of New York*, No. 13 Civ. 4016 (MKB), 2015 WL 4523154, at *2 (E.D.N.Y. July 27, 2015) ("[Rule 60(b)(6) motions] are disfavored and should only be granted upon a showing of 'extraordinary circumstances, or extreme hardship.'") (quoting *DeCurtis v. Ferrandina*, 529 F. App'x 85, 86 (2d Cir. 2013)).  Specifically, Plaintiffs have not presented any new facts that show that USTR's *contemporaneous* withholding decisions and this Court's affirmance of those decisions were wrong or unjust *at the time they were made*.  *See James v. U.S. Secret Serv.*, 725 F. Supp. 2d 207, 209 (D.D.C. 2010) (denying

reconsideration under Rule 60(b)(6) where plaintiff failed to "present any new facts or arguments showing that the Court's July 23, 2007 judgment upholding Defendants' disposition of his September 15, 2005 FOIA requests was unjust"); *Lion Raisins, Inc. v. U.S. Dep't of Agric.*, No. 05 Civ. 00062 (OWW), 2008 WL 3834271, at *10 (E.D. Cal. Aug. 14, 2008) ("Plaintiff Lion seeks a review of the FOIA decision by the agency anew, and not at the time of the denial, which has been finally decided.  Plaintiff Lion has not presented any evidence or argument on the original denial of its FOIA request.  It instead seeks to have the court review the FOIA denial in light of the present circumstances which the law does not support.") (citing *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991) (Ginsberg, J.)); *cf. Labow v. U.S. Dep't of Justice*, 66 F. Supp. 3d 104, 129 (D.D.C. 2014) [14]("Labow is not entitled to reprocessing because he has not shown that the government erroneously withheld the information when it processed his request in 2011 and 2012.") (citations mitted).  Instead, Plaintiffs invoke Rule 60(b)(6) to ask the Court to reassess USTR's withholding decisions under present day circumstances, bucking the "general rule" that "a FOIA decision is evaluated as of the time it was made and not at the time of a court's review."  *N.Y. Times Co. v. Dep't of Justice*, 756 F.3d 100, 110 n.8 (2d Cir. 2014) (citing *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991) (Ginsberg, J.)).[15] Plaintiffs are correct to argue the Second Circuit will permit consideration of agency disclosures made during the pendency of appeal and post-dating the district court's judgment affirming an agency's withholding decisions.  *See Florez v. Cent. Intelligence Agency*, No. 15 Civ. 1055, 2016 WL 3769948, at *7 (2d Cir. July 14, 2016); *N.Y. Times*, 756 F.3d at 111 n.8.  But the cases Plaintiffs cite do not fully the carry the day here, because they did not involve Rule 60(b)(6)

---

[14] *Opinion rev'd on other grounds*, 2016 WL 4150929 (2d Cir. Aug. 5, 2016).

[15] *Opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014), and *reh'g denied*, 762 F.3d 233 (2d Cir. 2014).

motions, and because the later disclosures in those cases were arguably used only to question the

agency's *original* withholding decisions, not to force the agency to provide new withholding

justifications based on an updated record. *Cf. N.Y. Times*, 756 F.3d at 111 n.8 (describing the

government's post-request disclosures as "inconsistent with some of its *prior* claims") (emphasis

added); *ACLU v. CIA*, 710 F.3d 422, 427–28 (D.C. Cir. 2013) (finding CIA's original response

that confirming or denying existence of documents would harm national security was no longer

logical or plausible given statements from President and two other top government officials).

That said, Plaintiffs make the much stronger pragmatic case, as it would "not serve the purposes

of FOIA or the interests of justice" to force Plaintiffs to file a new FOIA request and wait a

significant amount of time to receive essentially the same response that USTR has already

provided here. *Florez*, 2016 WL 3769948, at *7 (calling consideration of disclosures that post-

dated district court judgment "the most sensible approach," where refusing consideration would

relegate plaintiff to re-file FOIA request in order to receive same response agency made on

appeal, and concluding that "there is no reason we should not take into account the reality in

which this action proceeds"); *but see Lion Raisins*, 2008 WL 3834271, at *6 (denying

reconsideration under Rule 60(b)(6) because the plaintiff "has the ability to file a new FOIA

request based on the current conditions before the USDA," which demonstrated a "lack of

extraordinary circumstances").

The Court need not resolve this issue definitively.  Even after reconsidering USTR's

Exemption 1 withholdings on the current state of the record, the public release of the final TPP

text does not sufficiently defeat USTR's assertions of harm to foreign relations.

**B. USTR's Exemption 1 Withholdings Following the Signing of the TPP**

At the outset, it is important to clarify the scope of Plaintiffs' challenge to Exemption 1 withholdings on reconsideration.  Plaintiffs, repeatedly and explicitly, limit their request to disclosure of the "specific positions *that the United States* proposed or adopted in negotiations." Pl. 60 Br. at 8 (emphasis added); *see also* Pl. 60 Br. at 7; Pl. 60 Rep. at 2–3 & n.1.  Plaintiffs do *not* seek disclosure of the positions taken and proposals made by any of the other eleven participating countries, essentially conceding that such information is properly withheld.  *See* Pl. 60 Rep. at 3–4.  The core question raised by Plaintiffs' motion for reconsideration, then, is whether disclosure of positions that the United States proposed or adopted throughout negotiations, regardless of whether those positions ended up in the final agreement or not, are properly withheld under Exemption 1 because disclosure could logically or plausibly harm foreign relations.

FOIA Exemption 1 authorizes agencies to withhold information that is "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C.§ § 552(b)(1).  For its Exemption 1 withholdings, USTR relies on Executive Order 13526, entitled "Classified National Security Information."  Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526").  Information is properly classified under E.O. 13526 only if "the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security."  E.O. 13526 § 1.1(a)(4).  "Damage to the national security" is defined in part as "harm to the national defense or foreign relations of the United States…."  *Id.* § 6.1(*l*).

The main point of contention between Plaintiffs and USTR is whether disclosure could harm foreign relations. "Notwithstanding the presumption in favor of disclosure, when the claimed exemption implicates national security, 'an agency's justification for invoking a FOIA exemption is sufficient if it appears *logical or plausible*.'" *Ctr. for Constitutional Rights v. C.I.A.*, 765 F.3d 161, 166 (2d Cir. 2014) (quoting *Wilner*, 592 F.3d at 69) (emphasis added), *cert. denied*, 135 S. Ct. 1530 (2015). "Because the agencies responsible for national security 'have unique insights into what adverse [e]ffects might occur as a result of public disclosures,' courts are 'required to accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Azmy v. U.S. Dep't of Def.*, 562 F. Supp. 2d 590, 597 (S.D.N.Y. 2008) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

### (a) Decision Memoranda

The Decision Memoranda remain properly withheld under Exemption 1. *Cf. IP Watch I*, 134 F. Supp. 3d at 736–37 (noting that Plaintiffs' limiting their Exemption 1 challenge to positions proposed or adopted by the U.S. effectively insulated Decision Memoranda from disclosure). USTR's submissions confirm that these memoranda do not contain formal positions proposed or adopted by the United States—rather, they contain summaries of negotiations, "candid assessments" of outstanding issues, suggestions for future negotiation strategies, and pros and cons of whether to adopt or challenge particular stances taken by other countries on trade-remedy and copyright issues. *See* 2d Supp. Weisel Decl. ¶¶ 6–9 (representing that the Decision Memoranda do not contain draft text); Declaration of Victor Mroczka ("Mroczka Decl.") (Doc. 100) ¶ 16 (describing content of trade-remedy Decision Memorandum as "analyses of the pros and cons of whether the United States should engage on proposals regarding transparency and due process provisions in the TPP Trade Remedies chapter or draft its own

counter-proposal"); Supplemental Declaration of Probir Mehta ("Mehta Decl.") (Doc. 101) ¶ 13 (describing content of IP Decision Memorandum as "assess[ing] whether the United States should continue or change a particular stance on other TPP partners' proposals" and "if so, how to deploy that change in stance" given the "contentious and difficult" nature of issue).  The fact that U.S. negotiators "depart from positions suggested in the Decision Memoranda without changing, rescinding or redrafting them" confirm the transient nature of the content in these documents, belying the possibility that they contain formal proposals put forth by the United States.  2d Supp. Weisel Decl. ¶ 6.  And indeed, to the extent the Decision Memoranda do not contain any of the United States' own proposed or adopted positions, Plaintiffs do not even try to dispute the plausibility that foreign relations could be harmed by disclosure of USTR's candid assessments of other countries' proposals and interests.  *See* Mroczka Decl., ¶ 16; Mehta Decl. ¶ 13; 2d Supp. Weisel Decl. ¶ 24.

### *(b)  U.S. Proposals in Draft Chapters and ITAC Communications*

Although a closer question, USTR has also properly withheld draft text containing the positions that the U.S. proposed or adopted, whether that text appeared in the Draft Chapters or ITAC Communications.  USTR has provided a plausible account of why unilaterally disclosing the U.S.'s evolving negotiating positions and the extent to which the U.S. got its proposals adopted into the final agreement could harm foreign relations.  Specifically, disclosure could (i) harm relations with the eleven other TPP countries while the ratification process is ongoing, and (ii) harm ongoing and future trade negotiations, because disclosure would both violate the confidentiality agreement and reveal the evolution of U.S. positions on controversial trade topics.

*First*, Plaintiffs overstate the extent to which circumstances have changed since the Court's prior decision.  While the conclusion of negotiations over the final text is an important

milestone, the agreement will not come into force unless and until a certain proportion of participating countries approve the agreement through their domestic legal procedures. *See* TPP Art. 30.5. The TPP has been a salient and fraught political question in the United States, and its entry into force is far short of a sure thing.

Consequently, USTR officials continue to make a logical and plausible case for why disclosure of the U.S.'s own positions "could negatively affect the ongoing discussions" with the U.S.'s "TPP partners until entry into force." Supp. Mehta Decl. ¶ 14.[16] These officials plausibly attest that disclosure would reveal snapshots of U.S. proposals that could lead to problematic accusations against the other eleven TPP countries—that they were steamrolled by the U.S. from the start, or did not take advantage of favorable offers that the U.S. made and later retracted, or never fought hard enough for certain negotiating objectives with respect to particular topics, or made nefarious strategic decisions to favor certain special interests over others.[17] Such charges may be true, but they may not be, as piecemeal disclosures from different points in the negotiating process may distort the actual package of proposals that the U.S. was putting forth to its negotiating partners at any given point.[18] These types of accusations and second-guessing are

---

[16] *See* Mroczka Decl. ¶ 15 (same); McHale Decl. ¶ 11 ("Revealing these documents will undermine the ability of the United States to conclude the remaining processes required for entry into force of the TPP, which require politically sensitive steps on the part of trade partners, and which will continue to require confidential discussions on implementing measures."); 2d Supp. Weisel Decl. ¶ 23 ("[During ratification, the U.S.] will be working very closely with all of our TPP partners to ensure that each country fully implements the agreement. A public release by the United States of its own negotiating documents could negatively affect the ongoing discussions we must have with our TPP partners until entry into force.").

[17] *See* Supp. Mehta Decl. ¶ 9 (attesting that disclosure of interim positions could subject a counter-party to "unwarranted assertions that it failed to address a specific constituency's goals by offering either excessive concessions or not demanding sufficient concessions from others"); Mroczka Decl. ¶ 11 (same); McHale Decl. ¶ 9 (same).

[18] *Cf.* 2d Supp. Weisel Decl. ¶ 10 (providing that countries made decisions "to take positions for strategic or tactical negotiation reasons, with the understanding that their draft texts would not be public"); *see also* Supp. Mehta Decl. ¶ 11 ("[A] negotiating partner may take a position solely for tactical purposes to gain support for another priority proposal."); Mroczka Decl. ¶ 11 (noting that snapshots of proposals out of context "can reveal strategic decisions a country makes at a particular point that it is only willing to put forward if the package as a whole remains confidential"); Supp. Mehta Decl. ¶ 9 (same); McHale Decl. ¶ 9 (same).

conceivably the stuff of political attacks that could impede or even defeat ratification of the final agreement; that such obstacles would arise exclusively from unilateral disclosure by the U.S. could plausibly harm foreign relations with the other eleven TPP countries.[19]  As USTR's top negotiator attests, the how and why of evolving negotiating positions is "precisely what the multilateral confidentiality agreement is intended to protect," 2d Supp. Weisel Decl. ¶ 25, and whether the decision by all twelve participating countries to keep the negotiating process confidential until entry of force was necessary or wise, USTR has met its burden of providing at least a logical and plausible basis for it.[20]

Plaintiffs' only response to USTR's arguments about harm to the ratification process is to call them "vague and implausible" because it is "unclear what discussions would be impeded" following the conclusion of negotiations over the text itself. Pl. 60 Rep. at 5.  But this is somewhat disingenuous, because shedding light on possible objections to the final agreement prior to its entry into force is precisely why Plaintiffs urge this Court to order disclosure of the U.S.'s evolving negotiating positions.  *See id.* ("Even if secrecy is necessary during negotiations in order to reach agreement, once negotiations conclude, disclosure of the United States' own positions is necessary in order to inform debate in Congress (and, by extension, in public) about whether to ratify the agreement that resulted.")   While a noble endeavor, its nobility does not

---

[19] *See* Mroczka Decl. ¶ 12 ("If one TPP partner has difficulties in implementation, this would harm not only U.S. economic interests, but also those of the other TPP partners.").

[20] As the Court previously noted, and as Plaintiffs stress, the mere existence of a confidentiality agreement, standing alone, cannot satisfy the government's burden of showing harm to foreign relations.  *See IP Watch I*, 134 F. Supp. 3d at 737.  But placed in its individual factual context, breach of a particular confidentiality agreement can be significant in assessing the plausibility of the government's assertions of harm.  This is one of those cases:  It involves a complex multilateral trade agreement among twelve countries that make up a significant percentage of the global economy, born from a negotiation process that remains protected by a broad confidentiality agreement until the final agreement enters into force.  Contrary to Plaintiffs' belief, Pl. 60 Br. at 7, locking in the final text does not vitiate the purpose of the confidentiality agreement, at least not according to the twelve TPP countries, who all agreed to tether the termination of the confidentiality agreement to ratification, not to mere agreement on final text.

undermine the logic of USTR's belief that disclosure would create identical opportunities for interested parties in the eleven other participating countries.

*Second,* beyond ratification of the TPP, USTR has also made a plausible case that disclosure of the U.S.'s evolving negotiating positions could damage other ongoing or future trade negotiations with other countries.  This is so for two related but distinct reasons.  To start, the actual contents of these specific disclosures could harm other trade negotiations, because any country that enters into trade negotiations with the U.S. will have a blueprint of the U.S.'s evolving strategy and positions deployed throughout TPP negotiations.[21]  It is thus plausible that disclosure make future negotiations more difficult for the U.S., harming its "ability to maintain flexibility when conducting…negotiations by potentially locking the U.S. into positions that might not be optimal in other circumstances."  2d Supp. Weisel Decl.  ¶ 24.[22]

Even beyond the harm these particular disclosures may create, the precedent Plaintiffs attempt to establish here may create problems on its own:  If Plaintiffs prevail, future trade partners will know that the U.S. will not be able to abide by a commitment to keep its interim offers and proposals confidential.  *Cf.* Pl. 60 Br. at 7 ("[P]laintiff seeks to establish only the proposition that in these particular circumstances—where a multilateral agreement has been concluded and the text published for all to see—disclosure of the United States' own positions

---

[21] *See* 2d Supp. Weisel Decl.  ¶ 21 ("[R]evealing the United States' evolving positions on any particular topic could disclose the United States' negotiating tactics and strategies, including how strongly the United States may have advocated for a position, and decrease our ability to effectively use these tactics in other ongoing and future negotiations."); McHale Decl. ¶ 12 (attesting that revelation of a "U.S. proposal made at a particular time" in TPP negotiations, "when the United States currently is negotiating similar agreements in other fora, would put the United States in a disadvantageous tactical position" because "trading partners may use the document to insist on similar treatment in other contexts").

[22] *See* Supp. Mehta Decl. ¶ 15 (noting other ongoing intellectual-property and e-commerce negotiations involving similar issues, and representing that revealing positions or concessions made in TPP negotiations would put a country "in a tactically disadvantageous position" in other negotiations and mitigate the freedom such a country would "need to effectively offer different terms to different partners in different circumstances"); Mroczka Decl. ¶ 11 (same); McHale Decl. ¶ 10 (same).

and proposals during the course of negotiations would not plausibly harm foreign relations."). Plaintiffs argue that earlier, interim positions taken by the United States in the course of negotiations could not plausibly hamper future negotiations once the final text of the agreement is released. Pl. 60 Rep. at 4. But the mere fact that the final agreement may constrain future U.S. positions does not preclude the possibility that disclosure of earlier positions may do so as well. To the contrary, USTR makes sufficiently logical representations that future trade negotiations may become more difficult if other countries know that all of the U.S.'s interim positions and proposals made during future negotiations will be disclosed to the public once a final agreement is locked in.[23] Indeed, as USTR's top negotiator explains, these types of confidentiality agreements are critical to trade negotiations, and setting a precedent that the U.S. cannot abide by them would "dramatically undermine the United States' ability to obtain information from other partners and engage in sensitive policy discussions with countries around the world." 2d Supp. Weisel Decl. ¶ 22; *see also id.* at ¶ 20. Without this mutual trust in confidentiality, "countries are more likely to adopt and maintain rigid negotiating positions, significantly reducing the prospects for compromise and eventual agreement on terms favorable to the United States." *Id.* at ¶ 21. These representations are born from personal experience and made in good faith, and even if this Court were to think them overstated, it would still defer to the coherent and plausible views of the government officials actually tasked with conducting these high stakes negotiations. *See Ctr. for Int'l Envtl. Law v. Office of U.S. Trade*

---

[23] *See* Supp. Mehta Decl. ¶¶ 6–8 (representing that violation of confidentiality agreement would "damag[e] the trust that our foreign negotiating partners have in the United States to abide by its agreement to protect documents exchanged with an expectation of confidentiality for an agreed upon period," undermining U.S.'s ability to negotiate good trade deals in the future); Mroczka Decl. ¶¶ 8–10 (same); McHale Decl. ¶¶ 6–8 (same); Supp. Mehta Decl. ¶ 11 ("Without mutual trust that such positions will not be disclosed for the period agreed, countries are more likely to adopt and maintain rigid negotiating positions, significantly reducing the ability of the United States to obtain agreement on terms favorable to its security and economic interests."); Mroczka Decl. ¶ 14 (same).

*Representative*, 718 F.3d 899, 903 (D.C. Cir. 2013) ("The question is not whether the court agrees in full with the Trade Representative's evaluation of the expected harm to foreign relations. Rather, the question is 'whether on the whole record the [a]gency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility.'") (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).[24]

As a final point, there is one exception to the Court's re-affirmance of USTR's Exemption 1 withholdings. For the first time on this motion for reconsideration, USTR clarified that portions of six documents containing ITAC Communications were being withheld under Exemption 1 because they contained "suggested changes or additions to draft text that ITAC members themselves drafted…." 2d Supp. Weisel Decl. ¶ 13. USTR has not made a logical or plausible case that disclosure of text suggested by the private sector could harm foreign relations. *See* Pl. 60 Rep. at 5–6. Thus, USTR must either (i) disclose these portions of ITAC Communications to the extent they can be reasonably segregated from other information properly withheld under Exemption 1, or (ii) justify these withholdings under Exemption 3 in its additional submissions due on **September 30, 2016**.

---

[24] Plaintiffs further argue that USTR's assertions lack plausibility because unofficial leaks of draft TPP text during TPP negotiations did not prevent the parties from reaching a final agreement. Pl. 60 Rep. at 4–5. But this argument misses the mark for a few reasons. Participating TPP countries obviously did not gain any new knowledge or leverage from these leaks, so Plaintiffs' example does not speak to a case in which other countries not privy to TPP negotiations may leverage the disclosures Plaintiffs seek in separate negotiations against the U.S. Furthermore, unofficial leaks do not create the potentially problematic precedent that the U.S. could not keep its own proposals confidential following negotiations over the final text of an agreement. Beyond that argument, Plaintiffs are right to point out that USTR has not proffered a specific instance in which formal disclosure of its interim negotiating proposals constrained its position in another negotiation. Pl. 60 Rep. at 4–5. But of course Plaintiffs also cannot proffer a specific instance in which a court ordered the government to disclose such interim positions. Both parties press their positions only by reference to hypotheticals, and unfortunately for Plaintiffs, USTR need only proffer logical or plausible theories of harm to prevail, which it has.

### (c) Waiver

The two general reasons for upholding USTR's Exemption 1 withholdings—the ongoing

process of ratifying the TPP, and the potential harm to ongoing or future trade negotiations—

apply equally to draft proposals made or adopted by the U.S that ended up in the final agreement.

Plaintiffs argue, however, that the release of the final TPP text waived Exemption 1 protection

for the portions of the Draft Texts "that closely track or match the final version."  Pl. 60 Br. at 9–

10.  Official disclosure of previously classified information can waive Exemption 1 protection

where (1) the information requested is "as specific" as the information already disclosed, (2) the

information requested "matches" the information already disclosed, and (3) the information

disclosed was "made public through an official and documented disclosure."  *N.Y. Times*, 756

F.3d at 113, 120 (quoting *Wilson v. CIA*, 586 F. 3d 171, 186 (2d Cir. 2009)).

The Court is not persuaded that this is an appropriate case of waiver.  The information

Plaintiffs are requesting—the extent to which the U.S. proposed or adopted provisions that made

their way into the final agreement, and at which point in the negotiation process those proposals

were made—was not disclosed merely by the release of the final TPP agreement.  *Cf.* Pl. 60 Br.

at 12–13 ("Access to the information sought here will allow IP-Watch and others to understand

how USTR advanced and protected American interests, tracing the fate of USTR's positions and

proposals through to the final text.").  Release of the final TPP agreement discloses only the fact

that the final text was eventually agreed to by all twelve countries; it does not disclose which

country or countries proposed which provisions, when those proposals were made, and evolving

iterations of each proposal throughout the negotiations.  The final text itself, therefore, does not

"match" information that would "trace[] the fate of USTR's positions and proposals through to the final text."  *Id.*  Without that match, waiver is not applicable.[25]


## IV. CONCLUSION

Both Plaintiffs' and USTR's motions for summary judgment are denied at this time, and will be revisited after USTR has the opportunity to make further submissions establishing that the information and advice contained in the withheld ITAC Communications were submitted in confidence.  Once again, those additional submission are due on or before **September 30, 2016**, Plaintiffs' required response is due on or before **October 31, 2016**, and USTR's optional reply is due on or before **November 14, 2016**.

---

[25] While a "rigid" application of the "match" requirement would strip the waiver doctrine of its force, *N.Y. Times*, 756 F.3d at 120 n.19, Plaintiffs cannot leverage that doctrine to obtain *additional* protected information that just so happens to reside in the same document as already-disclosed information for which protection was waived, *cf. id.* at 119 (finding that government waived protection of legal analysis in a memo withheld under Exemption 1, but redacting portions of memo in which legal analysis was "so intertwined with [other] facts entitled to protection that disclosure of the analysis would disclose such facts").  Plaintiffs maintain that waiver applies only to draft text that is identical, "prefigure[s]," or is "similar in substance" to final text.  Pl. 60 Br. at 9.  But Plaintiffs' request, by its very nature, seeks not only the text itself, but when the U.S. proposed or adopted that text, and how it evolved throughout negotiations.  To put the point another way, the portions of the Draft Chapters that arguably "match" the final TPP text cannot be reasonably segregated from the information that Plaintiffs actually seek—whether, and at which points in the negotiations, the United States made or adopted proposals that ended up in the final agreement— and it is disclosure of that latter category of information that USTR plausibly claims would harm foreign relations. *Cf.* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."); *Conti v. U.S. Dep't of Homeland Sec.*, No. 12 Civ. 5827 (AT), 2014 WL 1274517, at *25 (S.D.N.Y. Mar. 24, 2014) ("Non-exempt portions of a document may only be withheld if they are 'inextricably intertwined' with the exempt portions.") (quoting *Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.*, 463 F.3d 239, 249 n.10 (2d Cir. 2006)).  While Plaintiffs are right to argue that protection for information in a draft document can plausibly be waived by its later disclosure in a final document, *see* Pl. 60 Rep. at 7 ("[R]evealing the same information in different contexts is precisely the function of the official disclosure doctrine."), that cannot be the case where disclosure of the context itself would reveal information that is otherwise protected—here, which U.S. proposals were made at what stages of the negotiations.

Plaintiffs' Rule 60(b) motion is denied in substantial part, with the small exception of the six documents withheld solely because they contained proposals made by ITAC members.

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 90.

It is SO ORDERED.

Dated:    August 31, 2016
          New York, New York

                                        Edgardo Ramos, U.S.D.J.

35