UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTELLECTUAL PROPERTY WATCH and
WILLIAM NEW,

               Plaintiffs,

    - against -

UNITED STATES TRADE REPRESENTATIVE,

               Defendant.

**OPINION AND ORDER**

13 Civ. 8955 (ER)

Ramos, D.J.:

Before the Court is a Freedom of Information Act ("FOIA") suit involving a request for communications relating to the Trans Pacific Partnership ("TPP"), a wide-ranging, plurilateral trade agreement formerly negotiated among the United States and eleven Asia-Pacific countries.[1] Intellectual Property Watch, a news organization that reports on international intellectual property issues, and its editor-in-chief, William New (together, "Plaintiffs") submitted their FOIA request to the United States Trade Representative ("USTR" or the "agency"). The parties cross-moved for summary judgment with Plaintiffs challenging USTR's withholdings and redactions of certain responsive documents that the agency determined were exempt from FOIA's disclosure requirements. *See* Docs. 42, 46, 48, 61.

Pursuant to two prior opinions, the Court granted in part and denied in part each of the parties' respective motions. *See Intellectual Prop. Watch v. U.S. Trade Representative* ("*IP Watch I* "), 134 F. Supp. 3d 726 (S.D.N.Y.2015); *Intellectual Prop. Watch v. United States Trade*

---

[1] On January 23, 2017, the United States withdrew from participation in the TPP. The remaining eleven Asia-Pacific countries are: Australia, Brunei Darussalam, Canada, Chile, Japan, Malaysia, Mexico, New Zealand, Peru, Singapore, and Vietnam. Declaration of Barbara Weisel (Doc. 44) ¶ 5. On march 8, 2018, the remaining eleven countries entered the Comprehensive and Progressive Agreement for Trans-Pacific Partnership, which incorporates much of what had been negotiated under the TPP. *See* https://www.csis.org/analysis/tpp-cptpp.

*Representative* ("*IP Watch II*"), 205 F. Supp. 3d 334 (S.D.N.Y. 2016).  The Court now principally decides whether certain communications withheld under Exemption 3, were "submitted in confidence" and therefore properly withheld pursuant to 19 U.S.C. § 2155(g)(2)-(3).

For the reasons set forth below, USTR's motion for summary judgment on the remaining communications is GRANTED, and Plaintiffs' motion is DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. ITACs and the TPP

The Court assumes familiarity with the record and its prior opinions in *IP Watch I* and *IP Watch II*, which detail the facts and procedural history of this case, and discusses here only those facts necessary for its disposition of the instant motions.  The Trade Act of 1974 (the "Trade Act") requires the President to "seek information and advice from representative elements of the private sector and the non-Federal governmental sector" regarding trade negotiations and policy. 19 U.S.C. § 2155(a).  The Act authorizes the President to establish industry-specific advisory committees, populated by representative members of key sectors and groups of the economy affected by trade policy.  *See* § 2155(c).  The result is a system of "industry trade advisory committees" ("ITACs") that are dedicated to different sectors of the economy and are comprised of members from the private sector who "provide policy advice, technical advice and information, and advice on other factors" relevant to trade negotiations.  § 2155(d).  These ITACs were called on during the course of TPP negotiations to provide counsel to U.S. Government negotiators.  Among the disputed documents at issue here are communications sent among ITAC members, USTR, and other private sector actors, discussing various issues related to TPP negotiations.  *See IP Watch I*, 134 F. Supp. 3d at 731–32.

**B. Plaintiffs' FOIA Request and *IP Watch I***

Plaintiffs submitted their initial FOIA request on March 23, 2012, seeking, among other things, draft text of TPP provisions related to intellectual property, U.S. negotiation positions regarding intellectual property, and communications between USTR and certain ITACs. USTR withheld all responsive documents save for some partial disclosures of communications between USTR and ITACs. After Plaintiffs filed suit in this Court on December 18, 2013, the parties entered into a joint stipulation pursuant to which USTR would undertake searches for a representative sample set of documents using search terms proffered by Plaintiffs, which would then provide the exclusive basis for the litigation going forward. As relevant here, USTR's searches produced roughly 700 pages of emails among USTR, ITAC members, and non-member, private-sector consultants, and forty-one pages of postings to the government's Cleared Advisor site, all of which were identified as a result of search terms provided by Plaintiffs. These communications are referred to as "ITAC Communications."

USTR withheld some ITAC Communications in full and some only partially by redacting portions of responsive communications. The parties cross-moved for summary judgment on the validity of USTR's withholdings.

*IP Watch I* was decided on September 25, 2015. *See IP Watch I*, 134 F. Supp. 3d 726. This Court upheld USTR's withholdings of memoranda and drafts chapters of the TPP, as well as select ITAC Communications pursuant to FOIA Exemption 1 (5 U.S.C. § 552(b)(1)), which exempts from FOIA information that is properly classified pursuant to an Executive Order. *IP Watch I*, 134 F. Supp. 3d at 736–39. Regarding the remaining ITAC Communications, USTR invoked FOIA Exemption 3 (§ 552(b)(3)), covering information specifically authorized to be withheld by statute, FOIA Exemption 4 (§ 552(b)(4)), covering trade secrets and confidential

commercial information, and FOIA Exemption 5 (§ 552(b)(5)), covering intra-agency documents that would be traditionally privileged in civil litigation. The Court rejected USTR's use of Exemption 5, holding that communications among ITACs and U.S. officials were not "intra-agency." *IP Watch I*, 134 F. Supp. 3d at 747–49. Additionally, although the Court held that the provision of the Trade Act governing ITAC Communications, 19 U.S.C. § 2155(g), served as a withholding statute for purposes of Exemption 3, the Court was unable to rule on the propriety of USTR's withholdings under Exemption 3 or 4 because USTR had not provided sufficient evidence to sustain its burden of withholding documents under those exemptions. Thus, the Court requested from USTR more detailed and document-specific justifications for the agency's withholdings under those two FOIA exemptions. *IP Watch I*, 134 F. Supp. 3d at 739–47.

### C. *IP Watch II*

To support its withholdings of ITAC Communications pursuant to Exemption 3,[2] in November and December of 2015 USTR submitted: (1) two *Vaughn* indices describing communications and providing withholding justifications for information submitted by email or posted to the Cleared Advisor Website and withheld almost exclusively pursuant to FOIA Exemption 3 (Doc. 78, Ex. 1; Doc. 71, Ex. 2); (2) affidavits and declarations of USTR employees and ITAC members attesting to the nature of those communications and the custom and practice of communications between USTR, ITAC members, and the private sector (Docs. 73, 74–75, 86, 88); and (3) a copy of the agency manual outlining the operations of the ITACs that was in effect at the time of the ITAC communications at issue here (Doc. 72, Ex. 1).

The twelve TPP countries signed the final agreement on February 4, 2016. On February 15, 2016, Plaintiffs moved under Rule 60(b) of the Federal Rules of Civil Procedure, seeking

---

[2] USTR withdrew its reliance on FOIA Exemption 4, relying exclusively on Exemption 3 to justify withholdings of ITAC Communications. USTR Letter (Doc. 70) at 3 n.3.

reconsideration of the Court's affirmance of the withholdings USTR made under Exemption 1. (Doc. 90). Plaintiffs urged reconsideration because the Court's reasoning in *IP Watch I* turned in part on the fact that TPP negotiations were still ongoing.

*IP Watch II* was decided on August 31, 2016. *See IP Watch II*, 205 F. Supp. 3d 334. Recognizing that the Court's prior opinion had determined that Section 2155(g) served as a withholding statute for purposes of Exemption 3, but had not expressly identified the operative test for determining when a communication is submitted "in confidence" under that Section, the Court clarified which standard controlled. In doing so, the Court adopted the well-established test set forth in *Landano* for FOIA Exemption 7(D), which exempts information submitted to law enforcement that could reveal the identity of a confidential source. *See U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993). The Court therefore held that the operative test for determining when a communication is "submitted in confidence" "is whether the submitter 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *IP Watch II*, 205 F. Supp. 3d at 346 (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 486 (2d Cir. 1999) (quoting *Landano*, 508 U.S. 165, 172 (1993)); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011). Having clarified the appropriate evidentiary standard applicable to Section 2155(g), the Court withheld decision on the cross-motions for summary judgment and permitted the parties to submit additional declarations or evidence and further brief that issue. *See IP Watch II*, 205 F. Supp. 3d at 348–49. The Court also determined that USTR could rely on the ITAC Manual to support its withholding of communications under Section 2155(g), which generally governs information submitted in confidence between the U.S. Government and members of the private sector, and that ITAC members were part of the private

sector for purposes of Section 2155(g)(2), which specifically governs "advice submitted in confidence by the private sector or non-Federal government" to the U.S. government or its advisory committees.  *See IP Watch II*, 205 F. Supp. 3d at 349–51.

Finally, the Court denied Plaintiff's Rule 60 motion in substantial part, principally reasoning that the public release of the TPP did not eliminate the risk that disclosure of memoranda and draft chapters could logically and plausibly harm foreign relations.  *See IP Watch II*, 205 F. Supp. 3d at 353–57.  The Court did, however, grant Plaintiff's motion for reconsideration with respect to six documents containing ITAC Communications that were withheld under Exemption 1 but for which USTR did not plausibly and logically explain could harm foreign relations.  *See IP Watch II*, 205 F. Supp. 3d at 358.

The Court now determines whether USTR has sustained its burden on summary judgment to prove that ITAC Communications were submitted in confidence and therefore properly withheld under FOIA Exemption 3.

### D.  New Submissions

In support of its position, USTR has submitted the following additional documents:  (1) the declaration of Jay Taylor, an ITAC member and Vice President of International Affairs at the Pharmaceutical Research and Manufacturers of America, who submitted and received certain withheld ITAC Communications and testifies to his understanding that communications with USTR were submitted in confidence (Doc. 110); (2) the supplemental declaration of Ingrid Mitchem, the Director of the Industry Trade Advisory Center, explaining the security briefings USTR provides ITAC members regarding the confidentiality of their communications (Doc. 111); and (3) the declaration of Janice Kaye, the Chief Counsel for Administrative Law and Ethics Official in the Office of General Counsel at USTR, explaining why the six documents

formerly withheld under Exemption 1 are properly withheld under Exemptions 1 and/or 3 (Doc. 112).[3]

## II. LEGAL STANDARD

FOIA generally requires agencies to disclose information in its custody unless that information "is exempted under clearly delineated statutory language." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (citation omitted). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009). The Court "decides *de novo* whether the agency has sustained its burden" to justify particular withholdings. *Bloomberg, L.P.*, 601 F.3d at 147 (citations omitted).

FOIA cases are generally resolved by cross-motions for summary judgment. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 73 F. Supp. 3d 350, 355 (S.D.N.Y. 2014) (citation omitted). "'[S]ummary judgment in favor of the FOIA plaintiff' is appropriate '[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption,' but should be denied if the agency satisfies its burden 'to show that requested material falls within a FOIA exemption.'" *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)). On the other hand, agencies can prevail on summary judgment by submitting affidavits that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the

---

[3] The Court notes that the parties are in agreement that there are no remaining communications being withheld under Exemption 1, to which Plaintiffs raise any objection. Rather the only remaining dispute centers on whether certain portions of those communications, *Vaughn* Index Nos. 2, 79, 83, 112, 123, and 124, are properly withheld pursuant to Exemption 3. *See* Defs.' Letter brief at 8; Pls.' Letter Brief at 12. USTR continues to invoke FOIA Exemption 1 in regards to several of the six ITAC Communications previously withheld under that Exemption. The Court is satisfied that USTR has properly invoked Exemption 1 with respect to certain portions of those communications reflecting draft TPP text. *See* Declaration of Janice Kaye; *Vaughn* Index Nos. 2, 79; *see also* 5 U.S.C. § 552(b)(1).

claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Wilner*, 592 F.3d at 73 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Such affidavits "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks omitted).

## III. DISCUSSION

### A. ITAC Communications Withheld Under Exemption 3

FOIA Exemption 3 applies to matters "specifically exempted from disclosure by statute," where that statute either "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. §§ 552(b)(3)(A). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Am. Civil Liberties Union v. F.B.I.*, 59 F. Supp. 3d 584, 594 (S.D.N.Y. 2014) (quoting *Wilner*, 592 F.3d at 72).

"In *CIA v. Sims*, 471 U.S. 159 (1985), the Supreme Court adopted a two-pronged approach to evaluating an agency's invocation of FOIA Exemption 3: First, the court must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3; second, the court must consider whether the withheld material satisfies the criteria of the exemption statute." *Wilner v. Nat'l Sec. Agency*, No. 07 Civ. 3883(DLC), 2008 WL 2567765, at *4 (S.D.N.Y. June 25, 2008), aff'd, 592 F.3d 60 (2d Cir.2009). USTR relies on 19 U.S.C. § 2155(g)(2)-(3) of the Trade Act as a basis for withholding portions of ITAC

Communications under Exemption 3.  In *IP Watch I*, this Court held that Section 2155(g), entitled "Trade secrets and confidential information," served as a withholding statute for purposes of FOIA Exemption 3 because it "establishes particular criteria for withholding or refers to particular types of matters to be withheld," 5 U.S.C. §§ 552(b)(3)(A), thereby satisfying prong one of the *Sims* test.  *IP Watch I*, 134 F. Supp. 3d at 741–43.

**B.  Information "Submitted in Confidence" under Sections 2155(g)(2) and (g)(3)**

Section 2155(g)(2) exempts from FOIA disclosure "information . . . and advice submitted in confidence by the private sector or non-Federal Government to [Federal employees], . . . or to any advisory committee established under subsection (c) of this Section [in other words, the ITAC].  Likewise, Section 2155(g)(3) exempts from disclosure "[i]nformation submitted in confidence by officers or employees of the United States" to ITAC members, "in accordance with rules issued by [USTR]" which, in turn, "shall define the categories of information which require restricted or confidential handling."  19 U.S.C. § 2155(g)(3).

Whether a document is properly withheld as confidential turns on the subjective expectation between the submitter and the receiver.  The operative test for whether information or advice can be withheld under sections 2155(g)(2) and (g)(3), therefore, is whether the submitter "provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred."  *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 486 (2d Cir. 1999) (quoting *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993)); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011).

To satisfy this test, "an agency must present evidence . . . such as notations on the face of a withheld document, the personal knowledge of an official familiar with the source[,] a

statement by the source[,] or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources." *Houghton v. U.S. Dep't of State*, 875 F. Supp. 2d 22, 32 n.4 (D.D.C. 2012) (citing *Ancient Coin Collectors Guild,* 641 F.3d at 511; *Campbell v. DOJ*, 164 F.3d 20, 34 (D.C. Cir. 1998)) (internal quotation marks omitted).  In any event, the evidence proffered by the Government must be "sufficiently detailed" to "permit meaningful judicial review." *Campbell*, 164 F.3d at 34.  Additionally, because (g)(3) requires that documents withheld pursuant to that provision comply with rules issued by USTR, USTR must demonstrate compliance with its rules.

The ITAC Communications at issue here can best be grouped into three categories:  (1) communications from ITAC members to USTR, for which USTR invokes § 2155(g)(2); (2) communications from USTR to ITAC members, for which USTR invokes § 2155(g)(3); and (3) communications including non-ITAC members of the private sector, for which USTR invokes § 2155(g)(2) and (3).  *See* Def's Letter Brief, dated November 7, 2016, Doc. 109, at 4–7.

### (i)  Communications from ITAC Members to USTR

USTR asserts that ITAC members submitted information to USTR with an expectation of confidentiality pursuant to Section 2155(g)(2), and that those communications are therefore exempt from disclosure under Exemption 3.  For support, USTR principally relies on the two *Vaughn* indices and declarations from USTR officials and ITAC members.  USTR points to the declarations of USTR officials Barbara Weisel and Melissa Keppel, the declaration of Ingrid Mitchem, the Director of the Industry Trade Advisory Center, and the declaration of Omar Kahn, a USTR official charged with managing the relationship between USTR and ITACs.  USTR also relies on the affidavits of three ITAC members:  Greg S. Slater, Douglas T. Nelson, and Jay Taylor, each of whom sent communications to USTR.

Specifically, Mitchem states that as a matter of course ITAC members are regularly provided a security briefing instructing them that their communications with USTR "are considered confidential." Supplemental Declaration of Ingrid Mitchem, dated October 25, 2016 (Doc. 111) ¶ 1. These briefings occur when a member joins an ITAC, when an ITAC is re-chartered, "and during mandatory annual online security refreshers during" a member's term of service. *Id.* Likewise, Kahn avers that it is the position of the Office of Intergovernmental Affairs and Public Engagement that the ITAC Manual is "co-extensive" with Section 2155(g) and therefore "protects from disclosure communications from private sector individuals . . . that were submitted in confidence . . . to USTR." Declaration of Omar Kahn**,** dated November 6, 2015 (Doc. 73) ¶ 3. Each of the three ITAC members noted above has submitted sworn declarations attesting to their belief that communications submitted to USTR were submitted in confidence. For example, Taylor asserts that he received security briefings instructing him as to the confidential nature of his communications, and that he was provided with the ITAC Manual and informed that, pursuant to section VI of the Manual and Section 2155(g) of the Trade Act, his communications "would be considered confidential, unless otherwise noted." Declaration of Jay Taylor, dated November 7, 2016 at ¶¶ 5–6. Although Slater and Nelson make no mention of receiving any security briefings, they likewise aver that they operated with the "understanding that [their, and their private sector affiliates',] communications would be held in confidence in accordance with [section] 2155(g)(2) and (g)(3) and section VI.C of the ITAC Operations Manual." Declaration of Greg S. Slater, dated November 5, 2015 at ¶ 5 (Doc. 75); Declaration of Douglas T. Nelson, dated November 3, 2015 at ¶ 6 (Doc. 74). The ITAC Manual—a contemporaneous document in force during the term of the ITAC members service— in turn requires ITAC members to receive a security briefing, sign a "classified non-disclosure

11

agreement," and "safeguard confidential information."  Manual at VI.1.  Finally, tracking the

substance of Section 2155(g)(2), the ITAC Manual informs members that "advice provided by

the Committees themselves" is one category of information that may be provided "to the U.S.

Government in confidence."  Manual at VI.4.

In response, Plaintiffs appear to concede this point and do not contend that USTR has

improperly withheld communications sent from ITAC Members to USTR pursuant to Section

2155(g)(2).  This is for good reason.  The language of the ITAC Manual and Section 2155(g)(2)

clearly protects from disclosure "advice submitted in confidence . . in connection with matters

[related to a member's ITAC service]."  19 U.S.C. § 2155(g)(2); *see* Manual at VI.4.  Likewise,

USTR officials' testimony that ITAC members were provided the ITAC Manual and given

security briefings informing them that their communications with USTR would be made in

confidence and the affidavits of three ITAC members, which all aver that they understood their

communications with USTR were made in confidence, are reasonably detailed and specific.  The

declarations from USTR officials rely on personal knowledge regarding the general practices of

USTR's work with ITAC members and the declarations submitted by ITAC members rely on the

actual experience of those members.  *See Wilner*, 592 F.3d at 73.  Because these affidavits are

"'not controverted by either contrary evidence in the record nor by evidence of agency bad

faith'" *id.* (quoting *Larson*, 565 F.3d at 862), they "are accorded a presumption of good faith,"

*SafeCard Servs., Inc.*, 926 F.2d at 1200 (quotation marks omitted).

USTR has therefore proffered ample probative evidence to demonstrate that it made

explicit assurances of confidentiality to ITAC members and, accordingly, satisfies its burden of

showing that communications from ITAC members to USTR were made "in confidence," as

required by *Landano* and its progeny.  *See Landano*, 508 U.S. at 172 (requiring that "the

particular source sp[eak] with an understanding that the communication would remain confidential"); *Ancient Coin Collectors Guild,* 641 F.3d at 511–12 (noting that "contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources" would be sufficient "to meet the government's burden"). Accordingly, USTR has properly withheld under Exemption 3 all ITAC Communications from ITAC members to USTR.

### (ii) Communications from USTR to ITAC Members

The question of whether USTR properly withheld communications sent by USTR to ITAC members under (g)(3) is more complicated and disputed vigorously by both sides. As previously noted, Section 2155(g)(3) states:

> Information submitted in confidence by officers or employees of the United States . . . to any [ITAC], may be disclosed in accordance with rules issued by [several agencies]. . . . *Such rules shall define the categories of information which require restricted or confidential handling* by such committee considering the extent to which public disclosure of such information can reasonably be expected to prejudice the development of trade policy, priorities, or United States negotiating objectives. . . .

19 U.S.C. § 2155(g)(3) (emphasis added).

Section 2155(g)(3) therefore embodies two requirements: (1) that the communication between federal employees and ITAC members be made in confidence, and (2) that the withheld communications comply with rules issued by USTR or other federal agencies, in this case, the ITAC Manual. Because an understanding of the ITAC Manual informs the parties' claims regarding whether the communications at issue were submitted in confidence, the Court turns first to the latter requirement.

### (a) The Requirements of the ITAC Manual

As an initial matter, the parties dispute whether documents *withheld* under Section 2155(g)(3) must comply with rules promulgated pursuant to that statute. In *IP Watch II*, the Court concluded that the ITAC Manual, which is promulgated by USTR and the U.S. Department of Commerce, could serve as one of these rules for purposes of withholdings made under Section 2155(g)(3). *See IP Watch II*, 205 F. Supp. 3d at 350–51. USTR now asserts that "the Trade Act protects *any* information submitted in confidence by USTR to ITAC members." USTR Reply, dated January 17, 2017 at 6 (emphasis in original). It claims that this conclusion follows because Section 2155(g)(3) requires only that the information be "submitted in confidence" by USTR, and then carves out from this general protection the limited circumstances under which documents submitted by USTR may be "'disclosed in accordance with rules issued by [several agencies].'" *Id.* (quoting 19 U.S.C. § 2155(g)(3)). Under USTR's view, however, the ITAC Manual does not limit or qualify the substantive scope of (g)(3)'s protections, but merely provides the conditions under which protected information may be disclosed.

Plaintiffs, on the other hand, contend that Section 2155(g)(3)'s protections are not unlimited, but circumscribed by rules promulgated by USTR, in this case the ITAC Manual. *See* Pls.' Letter Brief, Dated December 23, 2016 at 11. The Manual states that "[i]information provided in confidence by the U.S. Government to Committee members will in general be clearly designated as falling into one of two groups: . . . Security-Classified Information" and "Trade-Sensitive Information." *See* Manual at VI.1–3. Plaintiffs read the ITAC Manual as specifying that *only* communications falling into one of those two categories of information may be considered as "submitted in confidence" within the meaning of Section 2155(g)(3). Pls.' Letter Brief at 11. Here, USTR does not seek to withhold any communications as "security-

classified information" and instead opts to withhold all USTR-ITAC communications as "trade-sensitive information." *See* Def.'s Reply, dated January 17, 2017 at 6 & n.2.

The Court rejects USTR's claim that Section 2155(g)(3) protects "*any* information submitted in confidence by USTR to ITAC members." Def.'s Reply at 6 (emphasis in original). This claim runs counter to the Court's prior decisions in this case and is undermined by USTR's prior arguments before the Court. Section 2155(g)(3), provides not only that "[i]nformation submitted in confidence by [USTR] to any [ITAC], may be disclosed in accordance with rules issued by [USTR]," but it also instructs that "[s]uch rules shall define the categories of information which require restricted or confidential handling by [ITACs] considering the extent to which public disclosure of such information can reasonably be expected to prejudice the development of trade policy, priorities, or United States negotiating objectives." § 2155(g)(3). Accordingly, in concluding that Section 2155(g)(3) could serve as a withholding statute in *IP Watch I*, the Court read that language as "instruct[ing] USTR to establish rules for sorting between (i) information provided by the agency that requires 'restricted or confidential handling,' and (ii) information provided by the agency that is appropriate for 'public disclosure.'" *IP Watch I*, 134 F.Supp.3d at 741. In urging the Court to so hold, USTR argued that (g)(3) "explicitly refers to 'types of matters to be withheld,' as well as to 'specific criteria for withholding,'" and therefore satisfied the requirements of a withholding statute. Gov't Rep. at 9; *IP Watch I*, 134 F.Supp.3d at 740–1; *see also* 5 U.S.C. § 552(b)(3)(A)(ii) (exempting from disclosure material where statute "establishes specific criteria for withholding" or "refers to particular types of matters to be withheld"). USTR reasoned that this conclusion followed from the fact that it promulgated the Manual pursuant to (g)(3), and that although (g)(3) and, by extension, the Manual, "refer[red] to *disclosure* of categories of information in the agency's

discretion, that language necessarily affords the agency equal discretion to *withhold* the same categories of information." Gov't Rep. at 10 (emphasis added). Indeed, USTR's Associate General Counsel, Melissa Keppel, averred that withheld ITAC Communications "fall[] into one of [the] two categories" identified in the Manual. Supp. Declaration of Melissa Keppel ¶ 7, dated March 6, 2015, Doc. 63. Consistent with that reasoning, in *IP Watch II* the Court that held that USTR could rely on the Manual for withholdings made under (g)(3) because the Manual "categorize[d] information submitted by [USTR] into two groups—'Security-Classified Information' and 'Trade-Sensitive Information'" and provided guidance and examples "as to what constitutes those two categories" of information. *IP Watch II*, 205 F. Supp. 3d. 334 at 349–50. Having advocated that (g)(3) and the Manual refer to categories of information that may be withheld (and not just disclosed), USTR cannot now be heard to argue that neither (g)(3) nor the Manual limit the kinds of communications that may be withheld by establishing specific categories of information that are protectable. The Court therefore concludes that communications withheld pursuant to Section 2155(g)(3) must fall into one of the categories identified by the ITAC Manual: they must be "security-classified information" or "trade-sensitive information."

Next, the parties dispute whether communications submitted by USTR must be explicitly marked "trade-sensitive information" to be properly withheld. USTR appears to concede that none of the communications at issue were marked "trade-sensitive information." *See* Def.'s Letter Br. at 6; Pls.' Letter Br. At 11 (stating "none of the emails from USTR were marked 'trade-sensitive'"). Relying principally on the Manual's statement that "trade sensitive information . . . will be clearly identified to ensure proper handling," Manual at VI.3, § VI.4.(b), Plaintiffs contend that this failure is fatal and that USTR has therefore not demonstrated that the

communications it seeks to withhold satisfy the requirements set forth in the ITAC Manual. Plaintiffs' Letter Brief, Dated December 23, 2016 at 11. USTR, in contrast, asserts that (g)(3) does not require that communications be marked "trade-sensitive information" to be properly withheld. Def.'s Letter Br. At 6. In support of its claim, USTR notes that (g)(3) contains no express language requiring that documents be marked and the Manual does not affirmatively provide that USTR's failure to explicitly mark documents voids (g)(3)'s statutory protections. *Id.* USTR also relies on case law suggesting that procedural defects do not require the disclosure of the documents in question. *Id.* at 6–7.

The Court concludes that USTR's failure to mark documents "trade-sensitive information" does not defeat its claim for withholding. As an initial matter, the section of the Manual that establishes the categories of information that will be considered as "provided in confidence," states only that such information "will *in general* be clearly designated as falling into" the two established categories. *See* Manual § VI.B.1 (emphasis added). At a minimum, this language suggests, contrary to Plaintiff's claim, that an express marking of documents is not a prerequisite to proper withholding under (g)(3). *Cf. Bergheim v. Sirona Dental Sys., Inc.*, No. 17-548-CV, 2017 WL 4534784, at *2 (2d Cir. Oct. 11, 2017) (noting that "[a] general rule is, by definition, not an absolute bar").

Moreover, as USTR notes, nothing in (g)(3) requires that documents be marked to be properly withheld. Although (g)(3) instructs that rules promulgated pursuant to that statute "*shall* define the categories of information which require restricted or confidential handling," it does not require that documents so categorized must be marked or handled in a particular way. § 2155(g)(3) (emphasis added). This requirement is consistent with Exemption 3's mandate that statutes authorizing the withholding of communications establish "criteria for withholding" or

refer to "particular types of maters to be withheld." 5 U.S.C. § 552(b)(3). And notably, the language of Exemption 3 stands in stark contrast to Exemption 1, which exempts from disclosure matters that are "specifically authorized under criteria established by an Executive order" and requires that such documents "*are in fact properly classified pursuant* to such Executive order." *Id.* at 552(b)(1) (emphasis added). If Congress had wished to require strict adherence to procedural criteria, it could have codified it in either Exemption 3 or (g)(3), as it did in Exemption 1. Instead, (g)(3) cuts the other way. It provides that rules promulgated pursuant to that section "shall, to the maximum extent feasible, permit meaningful consultations by advisory committee members with persons affected by matters [relating to trade negotiations and trade policy]." § 2155(g)(3). In view of the broad aims this provision was designed to affect, the Court is reluctant to read (g)(3) or the Manual as imposing procedural requirements that find no basis in the statute and would thwart its stated aims.[4]

Here, the Manual defines "trade-sensitive information" as information that "would reasonably be expected to prejudice U.S. trade policy objectives if publicly disclosed" and provides a range of examples of the type of information that would qualify for protection under the Manual. Manual § VI.B.1.(b). Barbra Weisel, the Assistant United States Trade Representative for Southeast Asia and the Pacific and the chief negotiator for the TPP, avers that USTR solicited the views of ITAC members on topics ranging from technical decisions about the

---

[4] This conclusion is bolstered by the fact that even in the Exemption 1 context, "procedural defects do not necessarily require [that] document[s] be disclosed." *Allen v. Cent. Intelligence Agency*, 636 F.2d 1287, 1292 n.27 (D.C. Cir. 1980), *overruled on other grounds by Founding Church of Scientology of Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 830 (D.C. Cir. 1983); *see also Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 483–85 (D.C. Cir. 1980) (concluding that the belated classification of documents withheld pursuant to Exemption 1 was "insignificant" and did not "undermin[e] at all the agency's classification decision"). It is only where "procedural violations . . . undermine the agency's decision to classify"—that is to say, where the communications fail to meet the substantive requirements of an executive order—that "[a court] will . . . order documents to be released on that ground." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 857 F. Supp. 2d 44, 59 (D.D.C. 2012), *aff'd*, 715 F.3d 937 (D.C. Cir. 2013). That reasoning is instructive in the Exemption 3 context as well.

"wording choices in draft negotiating texts to comments on overall U.S. policy on trade-related issues." Declaration of Barbara Weisel (Doc. 44) ¶ 27. Weisel further testified that the U.S. and other participating TPP countries entered into a confidentiality agreement at the outset of negotiations. That agreement obligated participating countries to protect as confidential "emails related to the substance of the negotiations, and other information exchanged in the context of the negotiations" in order to "enable officials of participating governments to engage in frank exchanges of views, positions, and specific negotiating proposals."[5] *Id.* at 11–12. "The confidential nature of these exchanges," Weisel explains, "facilitate[s] the resolution of differing national interests and perspectives." *Id.* at 12. Conversely, the disclosure of such communications "would discourage such exchanges" and inhibit foreign engagement with USTR negotiators. *Id.* at 13. Likewise, Probir Mehta, the Acting Assistant U.S. Trade Representative for Intellectual Property and Innovation and a USTR negotiator, avers that he exchanged with ITAC members email communications that were "necessary to develop U.S. negotiating strategies and trade policy and to fully understand the potential impact of proposed treaty text." Probir Mehta Declaration, dated December 16, 2015 at ¶ 4.

---

[5] The confidentiality agreement states in full that:

> [A]ll participants agree that the negotiating texts, proposals of each Government, accompanying explanatory material, emails related to the substance of the negotiations, and other information exchanged in the context of the negotiations, is provided and will be held in confidence, unless each participant involved in a communication subsequently agrees to its release. This means that the documents may be provided only to (1) government officials or (2) persons outside government who participate in that government's domestic consultation process and who have a need to review or be advised of the information in these documents. Anyone given access to the documents will be alerted that they cannot share the documents with people not authorized to see them. All participants plan to hold these documents in confidence for four years after entry into force of the Trans Pacific Partnership Agreement, or if no agreement enters into force, for four years after the last round of negotiations.

Declaration of Barbara Weisel (Doc. 44) ¶ 11, Exhibit A at 2.

The Weisel and Mehta declarations demonstrate that that communications withheld under (g)(3) fall squarely within "trade-sensitive information" because they could "reasonably be expected to prejudice U.S. trade policy objectives if publicly disclosed." Manual § VI.B.1.(b). The fact that the U.S. committed to keep confidential "emails related to the substance of the [TPP] negotiations, and other information exchanged in the context of the negotiations," as explained in the Weisel declaration, clearly indicates that these communications "would reasonably be expected to prejudice U.S. trade policy objectives if publicly disclosed." *Id.*

Finally, the withheld communications also fall within the ambit of the examples provided in the Manual. For instance, communications relating to the development of "U.S. negotiating strategies and trade policy," as described in the Mehta declaration, necessarily "relate to U.S. negotiating objectives," which is an example of the kind of information that falls within the Manual's protected categories. *Id.* § VI.B.2. Likewise, communications relating to the development of "U.S. negotiating strategies and trade policy," readily qualify as information with "foreign policy concerns," as described in the Manual. *Id.* § VI.B.2. These declarations are entitled to "a presumption of good faith" and have not been rebutted by Plaintiffs. *See SafeCard Servs., Inc.*, 926 F.2d at 1200. As a result, communications submitted by USTR to ITAC members meet the Manual's substantive criteria and may be withheld notwithstanding that they were not specifically marked "trade-sensitive information."

### (b) Whether Documents meeting the Requirements of the ITAC Manual Were Submitted in Confidence

USTR contends that that its communications with ITAC members were submitted in confidence because USTR negotiators aver that they worked "with the expectation that such communications would remain confidential." USTR Letter Brief at 6. For support, USTR points to the declarations of USTR negotiators Weisel and Mehta, both of whom aver that they

personally exchanged emails with ITAC members with the understanding that such communications would be confidential because they were protected by (g)(3). USTR Reply at 6; Weisel Second Supplemental Declaration ¶ 13; Mehta Declaration ¶ 7. Weisel also stated that ITAC members must have security clearances and that USTR refers to them as "cleared advisors" for that reason. Weisel Declaration ¶ 23, dated October 29, 2014. Additionally, USTR relies on the Mitchem declaration for the proposition that, as a matter of course, USTR informed ITAC that their communications with USTR "are considered confidential, unless otherwise noted," per the terms of the Manual and Section 2155(g). Supplemental Mitchem Declaration ¶ 1, dated October 25, 2016, Doc. 111. And, as Mitchem notes, ITAC members were provided annual security briefings informing them "that they must keep communications from [USTR and the Industry Trade Advisory Center] confidential," and were required to execute a Classified Information Nondisclosure Agreement, obligating members to keep confidential any communications posted on the Cleared Advisor Site. *Id.* at ¶¶ 4–5. In light of the foregoing, the Court rejects Plaintiffs' claim that USTR's declarations "are little more than bare assertions that do not meet the standard for probative evidence." Pls.' Letter Brief at 11; *see Ancient Coin Collectors Guild,* 641 F.3d at 511–12 (noting that "contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources" would be sufficient "to meet the government's burden"); *Houghton v. U.S. Dep't of State*, 875 F. Supp. 2d 22, 32 n.4 (D.D.C. 2012).

Here, each of the USTR officials noted above provides a sufficient basis for their knowledge. Weisel and Mehta personally submitted communications to ITAC members believing that those communications would be held in confidence by ITAC members, pursuant to (g)(3) and the ITAC Manual. Likewise, the Mitchem declaration demonstrates that USTR

maintained a practice of regularly informing ITAC members in security briefings, held at the beginning of their tenure and annually thereafter, that communications with USTR would remain confidential, and the ITAC Manual explicitly states that "trade-sensitive information" is a category of information that may be provided in confidence. Manual § VI.B.1–2. The Court therefore concludes that USTR's expectation of confidentiality—which is principally based on the assurance that "trade-sensitive" documents are protected under (g)(3)—is based on sufficient probative evidence. *See Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 486 (2d Cir. 1999) (requiring that information be shared "under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred"); *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011). Accordingly, USTR has properly withheld communications pursuant to (g)(3).

### (iii) Communications Including Non-ITAC Members of the Private Sector

USTR seeks to withhold forty-four communications in which USTR or ITAC members sent emails to non-ITAC, private sector individuals,[6] and fourteen communications in which non-ITAC, private sector individuals sent emails to USTR and/or ITAC members.[7] *See* Def.'s Letter Brief at 7. In seeking to withhold these communications, USTR relies on Sections 2155(g)(3) and (g)(2), respectively. *Id.* Plaintiffs do not materially dispute that the communications at issue are protectable under Section 2155(g)(2)-(3).[8] Rather, they contend

---

[6] These documents include the following *Vaughn* index entries: 4, 6, 12, 14.2, 15, 19.1, 19.2, 20, 23.1, 23.2, 31, 34.1, 35, 38.1, 38.2, 39, 42, 43, 46, 49, 50, 52.3, 52.4, 59.1, 65, 67, 68, 69, 71, 74, 77.1, 77.2, 77.3, 82, 83, 87, 90, 104.1, 109.2, 111.2, 111.4, 111.6, 114 and 119. *See* Doc. 78, Ex. 1.

[7] These documents include the following *Vaughn* index entries: 14.1, 23.2, 34.2, 46, 47, 49, 52.3, 52.4, 71, 74, 109.1, 111.1, 111.3 and 111.5. *See* Doc. 78, Ex. 1.

[8] Plaintiffs in no way challenge USTR's reliance on Section 2155(g)(2), and make only a passing challenges to USTR's reliance on Section 2155(g)(3). Specifically, although Plaintiffs concede that (g)(3) "permit[s] ITAC members to meaningfully consult with non-ITAC members," Pls.' Letter Brief at 9 (citing Section 2155(g)(3) ("Such rules shall, to the maximum extent feasible, permit meaningful consultations by advisory committee

that the documents at issue here are not subject to withholding because there is insufficient evidence that these documents were submitted with an express or implied assurance of confidentiality.  *See* Pls.' Letter Brief at 3–4.  The Court agrees that that is the relevant inquiry irrespective of whether the documents were submitted by ITAC members/USTR or by non-ITAC members.

USTR contends that communications including non-ITAC private sector individuals were properly withheld pursuant to Section 2155(g)(2) and (3) because USTR has a "long-standing practice" of permitting ITAC members to consult with members in private industry so that USTR receives the most "robust advice possible."  Def.'s Letter Brief at 7.  For support, USTR relies on the declarations of Mitchem and Kahn, USTR officials responsible for managing the relationship between USTR and ITACs, as well as the ITAC Manual itself.  Specifically, Mitchem avers that Section VI.B.3 of the Manual "authorizes an ITAC member to consult with 'non-members in the private sector, both in their own firms or elsewhere in industry, who may be affected by proposed trade agreements or trade policy matters.'"  Mitchem Decl. ¶ 6 (quoting ITAC Manual, Section VI.B.3).  Mitchem explains that the Section VI.C of the Manual recognizes that "the private sector" specifically includes "individuals, firms, associations, and [ITAC] Committee members" themselves, and that such actors "may provide information to the U.S. Government in confidence in connection with trade negotiations.'"  Mitchem Decl. ¶ 7 (quoting ITAC Manual,

---

members with persons affected by matters referred to in subsection (a)."), they assert that (g)(3) "does not permit USTR to consult directly with non-ITAC members."  *Id.*  The Court finds this contention to be without merit.  The flaw in this argument flows from the fact that ITACs are managed by the USTR, which is obligated to "make available to the [ITACs] such staff, information, personnel, . . . and assistance as it may reasonably require to carry out its activities," 2155 (b)(3), (h), and is the body that conducts trade negotiations on behalf of the United States. Indeed, the individuals Plaintiffs claim vitiate the ITAC members' expectation of confidentiality are the very individuals that were charged with negotiating the TPP based on the advice provided by ITAC members and non-ITAC members.  For example, Probir Mehta, an Acting Assistant U.S. Trade Representative charged with negotiating the TPP, is one such individual Plaintiffs claim destroys ITAC members' expectation of confidentiality. In short, the whole point of ITACs having "meaningful consultations" with the private sector is so that USTR can negotiate effectively.  To deny USTR's access to this information is to thwart the negotiation itself.

Section VI.C).  According to Mitchem, that provision was "drafted to be . . . consistent and co-extensive with Section [2155](g)(2)."  *Id.* ¶ 9; *see also* Kahn Decl. ¶¶3–4 (stating that the Manual and Trade Act "protect from disclosure communications from private sector individuals . . . to USTR regarding proposed trade agreements and trade policy matters").  And, as noted above, Mitchem avers that ITAC members were provided security briefings during which they were advised that their communications with "private sector individuals" would need to be kept confidential.  Mitchem Supp. Decl. ¶¶ 1–2.  Additionally, USTR points to the testimony of Mehta, the Acting Assistant U.S. Trade Representative charged with negotiating the TPP, who testified that he believed his communications with non-ITAC members would be held in confidence pursuant to Section 2155(g)(3) and the ITAC Manual.  Mehta Decl. ¶¶ 6–9.

USTR also notes that four ITAC members specifically aver that they, *and* their affiliates, employees, or colleagues, as the case may be, understood their communications regarding TPP negotiations would be held in confidence.  Def.'s Letter Brief at 7; *see* Declaration of Douglas T. Nelson, dated November 3, 2015, Doc.74, ¶¶ 8–9 ("I and [firm] affiliates provided USTR with the above information, advice and analyses with the understanding that they would remain confidential"); Declaration of Greg S. Slater, dated November 5, 2015, Doc. 75 ¶¶ 5–8 ("I and other [firm] employees provided USTR with the above information, advice and analyses with the understanding that they would remain confidential."); Declaration of Jay Taylor, dated November 7, 2016, at ¶¶ 6-10 ("I and my . . . colleagues provided USTR with . . . information, advice and analyses with the understanding that they would remain confidential."); Ives Declaration, Doc. 113, Ex. 1, ¶¶ 5-10 (same).  On these bases, USTR concludes that communications including non-ITAC members were provided under an express assurance of

confidentiality from both ITAC members and their private sector colleagues.  *See* USTR Reply at 1–4.[9]

In response, Plaintiffs challenge both the ITAC members/USTR's expectation of confidentiality as well as the expectation of non-ITAC members.  This first contention can be dealt with easily, as there is overwhelming probative evidence that ITAC members/USTR communicated with non-ITAC members with an expectation of confidentiality.  In addition to the declarations from four ITAC members averring that they understood their own communications with non-ITAC members would be kept in confidence, the declarations of Mitchem, Kahn, and Mehta, and the ITAC Manual itself, provide ample evidence that ITAC members were informed as a matter of course that their communications with the private sector would be provided "in confidence."  Mitchem Decl. ¶ 7 (quoting ITAC Manual, Section VI.C ("the private sector . . . may provide information to the U.S. Government in confidence in connection with trade negotiations")).  The declarations by individual ITAC members/USTR are probative evidence of an express assurance because they are "statements by the source" that they understood their communications would be held in confidence.  *See Houghton*, 875 F. Supp. 2d at 32 n.4 (citing *Ancient Coin Collectors Guild,* 641 F.3d at 511; *Campbell*, 164 F.3d at 34).  Likewise, the declarations from Mitchem and Kahn, who oversaw the ITACs, is sufficient because they provide "personal knowledge of an official familiar with the source[s]" and because the ITAC Manual they rely on is a "contemporaneous document[] discussing practices or policies for dealing with the source or similarly situated sources."  *Id.*

---

[9] In its reply, USTR offers the affidavit of Philip Agress, a non-ITAC member and Senior Vice President at the Advanced Medical Technology Association ("AdvaMed"), with whom ITAC member Ralph Ives consulted.  USTR Reply at 2.  Agress states that Ives "assured [him] that the advice and information [he] provided would remain confidential, and directed [him] to keep confidential information [he] received from [Ives] and/or USTR regarding the TPP."  Declaration of Philip Agress, dated January 12, 2017, Doc. 120, ¶ 6.  Although the Court finds this declaration further supports the conclusion, discussed *infra*, that non-ITAC members gave and were given express assurances of confidentiality, it concludes that such declarations are not necessary to its holding.

Plaintiffs largely fail to address these declarations, which rely on Section 2155(g)(3)'s express mandate that ITAC members be permitted to "meaningful[ly] consult[]" with members of the private sector. *See* § 2155(g)(3). Instead, Plaintiffs assert that ITAC members had no expectation of confidentiality in their communications with non-ITAC members because the ITAC Manual directs "that care should be taken not to disclose . . . trade-sensitive information itself." Pls.' Letter Brief at 8. Notwithstanding that proviso, the Manual *also* instructs that information provided by the private sector is "provided in confidence," and directs that such information be kept confidential because it "may include . . . industry data regarding productive capacity, labor costs, and marketing strategies; the effects of various negotiating results on firms' financial performance; and final positions in connection with various issues under negotiation." Manual at VI.1.C. Plaintiffs' analysis, therefore, fails to account for the fact that ITAC members may derive their expectation of confidentiality from the information being received from, and discussed with, members of the private sector. That directive, in combination with the language of Section 2155(g)(3), provides a reasonable basis for the ITAC member's expectation of confidentiality.[10]

Next, Plaintiffs contend that there is no "probative evidence" that the non-ITAC members receiving or sending the communications at issue also received an express or implied assurance of confidentiality. Pls.' Letter Brief at 6–7. Indeed, they stress that the declarations provided by USTR "merely reiterate that the ITAC members provided information under an assurance of confidentiality; not that the non-ITAC members did so." *Id.* at 7. That contention, however, is controverted by the declarations themselves.

---

[10] Moreover, even if ITAC members provided, erroneously or otherwise, "trade-sensitive information" to non-members, the Court is not persuaded that such an error would forfeit the protections of Section 2155(g)(3), given its purpose is to ensure meaningful consultation, or that disclosure would be the appropriate remedy.

As noted above, each of the ITAC members who has submitted a declaration stated that they and their affiliates, employees, or colleagues communicated with the understanding that their communications "would remain confidential."[11]  Such evidence is plainly sufficient under the case law, which provides that probative evidence of an express grant of confidentiality may come in the form of "the personal knowledge [by someone] familiar with the source." *Houghton*, 875 F. Supp. 2d at 32 n.4 (quoting *Ancient Coin Collectors Guild,* 641 F.3d at 511; *Campbell*, 164 F.3d at 34); *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1061 (3d Cir. 1995) ("Proof could take the form of declarations from the agents who extended the express grants of confidentiality . . . .").  Each of these declarants has a personal basis for their knowledge, as each is an ITAC member who holds a senior position at a corporation or industry trade association and *corresponded directly* with the non-ITAC members, with whom they worked alongside or managed.  *See Campbell*, 164 F.3d at 34–35 (requiring "personal knowledge of the particular events" at issue, and finding that an affidavit in which an FBI agent "simply asserted that various sources received express assurances of confidentiality without providing any basis for the declarant's knowledge of this alleged fact").

More to the point, and as discussed *supra* in footnote 9, Defendant has provided a declaration from a non-ITAC member who provided information to an ITAC member.  Agress Declaration ¶ 6.  Agress clearly states that he was assured that his information would be treated

---

[11] Plaintiffs assert that to the extent ITAC members attest to the non-ITAC members own understanding, that testimony is hearsay, and may not be considered at summary judgment. Pls.' Letter Brief at 7.  Plaintiffs do not specify what the out of court statement that is being offered for the truth of the matter asserted is.  As the Court reads the declarations, the declarants are testifying to their own understanding, and such affidavits are admissible as non-hearsay under Federal Rule of Civil Procedure 56.  *See* Fed. R. Evid. 802 (noting that Rule 56 exempts "affidavits in summary judgment proceedings" from exclusion as hearsay); Fed. R. Civ. P. 56(c)(4) (requiring declarations be "made on personal knowledge").  This obviously does not exempt all statements within a declaration from a hearsay challenge.  But in the present case the declarants' statements are based on their own personal knowledge (we understood our communications "would remain confidential"), and do not advance any unsworn, out of court statements.

confidentially.  *Id.*  Plaintiffs have offered no reason to question the veracity of these affidavits.
And, to the contrary, there is every reason to credit representations from senior leaders in
industry who claim to have reached mutual assurances of confidentiality with their colleagues.
After all, these interested parties were disclosing industry-sensitive information with the
potential to negatively affect their organizations if disclosed publicly.  Indeed, these private-
sector leaders aver that they would be significantly less likely to engage in such government
consultation if their views were not kept confidential.  *See* Declaration of Douglas T. Nelson,
dated November 3, 2015, Doc.74, ¶¶ 7–9 (discussing why members of declarant's organization
would seek to keep their industry-specific advice confidential); Declaration of Greg S. Slater,
dated November 5, 2015, Doc. 75 ¶¶ 6–8 (same); Declaration of Jay Taylor, dated November 7,
2016, at ¶¶ 8-9 (same); Ives Declaration, Doc. 113, Ex. 1, ¶ 9 (same).

Accordingly, the Court concludes that communications between ITAC members/USTR
and non-ITAC members are properly withheld to the extent that the declarants (and their non-
ITAC-member counterparts) referenced herein are included in the communications at issue.[12]

## IV. CONCLUSION

For the reasons set forth above, USTR's motion for summary judgment on the remaining
communications is GRANTED, and Plaintiffs' motion is DENIED.

It is SO ORDERED.

Dated:     September 30, 2018
           New York, New York

                                                Edgardo Ramos, U.S.D.J.

---

[12] To the extent that any communications in dispute involve ITAC members or non-ITAC members not referenced
in these declarations, USTR has not demonstrated its entitlement to withhold those communications.  *See Landano*,
508 U.S. at 178 (noting that the government is not entitled to a "blanket" presumption that confidential sources
speak under a commitment to confidentiality).